## ALF MIERS V. THE STATE.

### *No. 389. Decided March 2.*

**1. Murder—Illegal Arrest—Resistance to.**—On a trial for murder, where the evidence showed that defendant had been arrested, without a capias, by deceased, who was a constable, *Held*, that in making the arrest deceased was a trespasser, and defendant had the right to resist, using no more force than was necessary to resist the unlawful acts of the officer.

**2. Same.**—A party who has yielded without resistance or without protest to an illegal arrest, does not thereby forfeit his right to regain his liberty; nor does his acquiescence in an illegal arrest convert the trespass into a lawful act. Being falsely imprisoned, a party, under such conditions, for the purpose of regaining his liberty, can use all force necessary for that purpose, taking care to use no more than is required.

**3. Same—Right to Resort to Deadly Weapons.**—If a party who has been illegally arrested attempts to regain his liberty, and the officer or party holding him in arrest proposes to prevent this by the use of deadly weapons, the party illegally arrested may resort to such weapons; and if a party illegally arrested flees from such arrest, and the officer presents his gun in a shooting position, commanding him to halt, he may shoot, if it reasonably appears to him that the officer will shoot.

**4. Same—Manslaughter—Self-Defense.**—If a homicide be committed in the resistance to an illegal arrest, and no express malice be shown, the crime would be manslaughter, if more force was used than was necessary to prevent the arrest, or regain liberty after being arrested. If no more force be used than is necessary, then no offense is committed, the homicide being justified.

**5. Same—Illegal Arrest—Status of Officer Making.**—An officer making an arrest without authority to do so, occupies the same relations to the party arrested that any other private citizen would. He is a trespasser, who has no right to detain the person, and hence no right to prevent an escape; and in preventing an escape, he is still a trespasser, and stands to the prisoner on the same ground as a private citizen.

**6. Charge of the Court in Felony Case—Law Applicable.**—In a felony case the court must give in charge to the jury the law applicable to the case, whether requested to do so or not; what law is applicable is determined by the charge in the indictment and the evidence adduced at the trial. In determining the law which is applicable, the case must be clearly understood by the judge, whose duty it is to apply the law.

**7. Case Stated—Law Applicable Thereto.**—Appellant was illegally arrested, and attempted to regain his liberty. The deceased, who was a trespasser, threw his Winchester upon him, covering him with it. Appellant charged his gun while deceased was covering him, and he still retreating. Deceased, with his gun in shooting position, demanded of appellant to halt, when they both shot, shooting at the same time, each receiving wounds; that of deceased proving mortal. *Held*, as the law applicable to the case, the court should have instructed the jury, that the arrest was illegal, and that the deceased was a trespasser in making the arrest and detaining the prisoner; that appellant had the right to regain his liberty, and that deceased had no right to prevent him; and that if deceased, to prevent an escape, threw his gun upon him, demanding him to halt, and that appellant believed that his life was in danger, or that he was in danger of serious bodily injury, and that he shot and killed deceased, to acquit him.

**8. Murder—Evidence—Capias for Arrest of Defendant.**—On a trial for murder upon the facts as stated in paragraph 7, *Held*, that it was error to admit in evidence the issuance of a capias from another county for the arrest of defendant for burglary.

9. **Murder—Evidence of Character of Deceased.**—On a trial for murder, where the State was permitted, over objection of defendant, to prove that deceased was a good man, *Held,* inadmissible, the deceased not being on trial, and his character not having been attacked by defendant.

10. **Same—Evidence of Character of Defendant.**—On a trial for murder, where the State, over objections of defendant, was permitted to prove by a witness that he, the witness, had told the deceased a short time before the homicide, "You have a pretty bad man to arrest, and that they would all shoot," *Held,* the evidence was incompetent and inadmissible.

11. **Charge—Self-Defense—Presumption of Law.**—On a trial for murder, where the court had properly instructed the jury upon self-defense, but added, "And in this connection you are further told, that if you find that Burnett first assaulted the defendant by drawing his gun to fire and not to halt defendant, then the law presumes that he intended to inflict serious bodily injury or kill the defendant." *Held,* the charge was wrong, and calculated, in connection with a statement made by the deceased to one of the witnesses to induce the jury to believe, that if deceased's intention was to rearrest defendant, that he had a right to do so.

12. **Same—Submission to Arrest—Escape and Prevention by Officer.**—On a trial for murder, where the court charged the jury, "You are further instructed, that if you believe from the evidence that the defendant, Alf Miers, had submitted to his arrest by Riley Burnett, and after such submission broke away from the custody of said officer, with the intent to escape from the arrest to which he had submitted, that the officer, Riley Burnett, had the right to prevent said escape;" *Held,* the charge was erroneous.

13. **Same—Self-Defense.**—On a trial for murder, where the court charged the jury, "But if a person submit to arrest and acquiesces in the authority of the officer to make the arrest, he waives every objection or right he may have made to any irregularity or illegality in the same, or the arrest; and if thereafter he breaks away from the officer he acts unlawfully, and in a conflict between him and the officer, consequent thereon, he in law would be the aggressor; and if by his conduct or with deadly weapons he leads the officer to reasonably apprehend danger to life or serious bodily harm, he can not invoke the law of self-defense in any subsequent conflict." *Held,* that the instruction is not the law, but an outrage upon law.

14. **Murder of the Second Degree—Evidence Insufficient.**—See facts stated, upon which the court holds, that a conviction for murder of the second degree is against the evidence.

APPEAL from the Criminal District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

This appeal is from a conviction for murder of the second degree, with punishment assessed at imprisonment in the penitentiary for a term of twenty-five years.

The court has instructed the Reporter to give all the facts in the case. The following is a full and substantial statement of the essential evidence as shown by the statement of facts:

Dr. D. W. Gilbert testified. "Knew Riley Burnett, deceased, and attended him in his last sickness, at the house of George Metker, on the 2nd day of August, early in the morning, about 9 or 10 o'clock. I reached the house between 7 and 8 o'clock, and found deceased suffering from a gunshot wound in the right chest, entering between the third and fourth ribs, and coming out just behind the shoulder blade. Think the ball went pretty nearly straight through him. Did not

probe the wound. He died from hemorrhage caused by the breaking of some blood-vessel. Think the wound was the cause of his death.''

Cross-examined: ''Heard deceased make no statement as to how he came to be wounded. Suppose he died about an hour or an hour and a half after he was wounded. Saw Alf Miers, defendant, there that day. He was lying on a bed in the kitchen at George Metker's house, and was also suffering from a gunshot wound. The ball had entered the third knuckle joint on his right hand, went down the length of the hand, striking the wrist joint, shivering and breaking away about two or three inches of the carpus bone and the ulna, and then after passing through the forearm, penetrated the body above the left nipple, above but in the region of the heart, and came out under his left shoulder. It was quite a large hole. I dressed the wound. He said something like this: 'Go and attend to Burnett; do not let him die; let me alone.' He was in great pain at the time. The wound did not penetrate the chest cavity; it ran around the ribs. Defendant suffered greatly, and the wound left the arm more or less crippled.''

Dr. G. McCollum arrived at Metker's house after Dr. Gilbert had reached there, and he corroborated Dr. Gilbert's testimony as to the location, appearance, and character of wounds, both upon the deceased and the defendant.

O. Metker testified: ''I was living at home, northwest of here, when this affair occurred, in Dallas, County, about fourteen miles northwest of here. I knew Riley Burnett. I know Alf Miers. Alf Miers is a nephew of mine—no, a brother-in-law of mine. Riley Burnett came to my house. He drove up some horses, and was going to put them in my lot. He was catching a mule there. Alf Miers, as well as I can recollect, was on the porch. Charlie, my son, went in the lot with a rope, and they caught the stray mule. Alf Miers stepped up there to catch the mule, and Riley said he would have to arrest him. Alf asked him what for, and Riley said for burglary in Shackleford County. Alf asked him for the papers of the arrest, and I think he said he did not have to have any. I would not be certain of that, though. Alf says, 'You aint going to take me off before breakfast? it is pretty early in the morning.' Riley says, 'Yes, I am going to take you off; I will get you your breakfast.' I think Alf asked him again if he would not let him go to the house and get breakfast, and I think his clothes, and Riley agreed to let him go to the house to eat his breakfast, and they all started. I think Riley was in front and Alf and Pete Burnett were behind. I was behind them when they went to the house. I was right about there by the cowpen gate when this mule was caught. I was turning out the cows. Charlie is my son. He was there, and my wife and Webb Walker. I do not recollect if the others were there or not. I do not really know whether George was there. I think he was out there on the other side of the lots, but I will not be certain. Webb Walker was there somewhere; I think they were together [referring to George and Walker.]

They went out there after the horses. I do not know whether they were there in the lot or not; I could not be certain, but I believe they were. My daughter was in the house—Ida May. I think that was all. I think my wife was out there about the lot somewhere; I could not tell you where. I started a while ago to tell you about how I started to go to the house. I started, and when I stepped on the porch Riley Burnett ran across the porch with a gun—out across the corner of the house. I could not tell you where he got the gun, but it was a Winchester; it belonged to my son George, I think. I could not tell you exactly how far he was ahead of me, but some distance. I guess he was about six feet ahead of me, or maybe a little further. I could not tell you whether there was any one between us or not. When I got on the gallery, Riley Burnett was making like he was going around the east corner on the southeast corner of the kitchen. I do not know where Alf Miers was; I did not see him at all. I could not tell you where Charlie Metker was. George had started to the well, and when we came from the lot George had started to get a bucket of water. I could not tell you where Pete Burnett was. I could not tell you where my wife was. If she was standing on the porch, I didn't see her. I did not see any of the rest of them there at all, that I recollect of. I do not know what happened next. I suppose there was a shot fired. I could not tell who fired it, because I did not see it fired. I didn't hear but one shot fired, and Riley turned round and came back, and said, 'I am shot.' I told him to come here. I did not think he was shot at first, as I didn't see any blood, and I handed him my hand and he came up on the porch, and when he came up the blood ran out of his sleeve. That was his right hand. The next thing that happened, I think, was, he stood there maybe a little, and turned around and said, 'Lay me down,' and they took him in the house. I do not know who was the other one that took him in, but I was one. I took him in at the south door, and laid him on a pallet in the west room. There were two rooms in the house. The house sits east and west; the porch on the south side, a window and a door on the south, and a window and a door on the north, in the west room. There was a door and a window on the south side of the west room. There was a door and a window in the east room, on the south side. These doors opened on the gallery. There was another way of getting out of the east room; there was a door at the east end of the kitchen. There was no gallery on the east end. The gallery that was on the south side of the house did not extend the whole length of the house. It extended along far enough to take the south door on the east room, and just took it in. We took Riley in the west room at the south door. We took him across the gallery into the house, and laid him down on the pallet. I could not tell you the time of day, but it was pretty early in the morning, and we had not had breakfast. Alf Miers was staying at my house at the time, but I do not know how long he had been there—somewhere along a couple of weeks—but I do

not recollect now, and could not tell you how many weeks. He told me he came from Wichita Falls. I had not seen him since he was a little boy 10 or 12 years old. He slept in the house, first one place and then another; sometimes in the house and sometimes in the yard. All of them had done that. I did not see that he brought anything with him when he came, except his Winchester. He kept that gun first in one place and then in another. When he slept at the house, he slept sometimes in the east room and sometimes on the bed, and sometimes out of doors. The cooking was done in the east room. There was a bed in that room also. There were two beds in the west room. Me and my daughter occupied the west room; my wife was up at Eli Perkins', a son-in-law of mine. She staid up there with my daughter. She has been staying there since last spring. Me and my wife do not stay together. When they all gathered there they took Riley from the pallet and laid him out on the bed in the west room, until they took him off. When I say they took him off, I suppose they took him to his father's; that is where they said they were going to take him. He was pronounced as being dead."

Cross-examined: [Defendant's counsel introduced a diagram of the house where the homicide was committed, which witness Metker recognizes as being a plat of his premises.]

[SEE NEXT PAGE FOR PLAT.]

DIAGRAM OF METKER'S HOUSE,
Where killing of Riley Burnett took place, on August 2, 1893.

"There is a door and a window each in the north of the west room.
In the northwest corner of the east room there is a partition that runs
up about eight feet high. There is a place partitioned off for a
granary, and parallel with the granary is the bed. There is a south
window and a south door to the east room, opening on the porch. There
is an east door to that kitchen or east room, leading out in the yard.
This porch commences at the west end of the house, south, and runs
with the house down to and so as to include the south door of the east
room, which opens on the porch. It is about nine or ten feet from the
end of the porch to the end of the house there. On the east end of
the floor there are several planks out. The main bedroom has a
double bed in the northeast corner of the west room. There is a
double bed in the southeast corner of that room. Immediately west
of the porch, about thirty or forty feet, there is a cow lot, first, and
then a horse lot; that is, west of the porch. To the cow lot I expect
it is about ten or twelve steps from the west end of the house, and
then I expect it is about twenty or twenty-five steps to the horse
lot. The door on the east end of the house does not sit exactly in the
middle; it is nearer to the northeast corner than it is the south. As I
stated before, I recognize this as a rough diagram or plat of my
premises. My artesian well is west and about on a line with the north
line of the house. A line drawn east and west with the north line of
the house would about hit my well. I expect the well is about fifty or
sixty steps from my house, down in the hollow. That was the well
where George went to get water. This partition wall between the
two rooms I spoke of awhile ago is made out of logs about four inches
square. They stood on top of one another, about two or four inches
apart, and the wall was about nine or ten logs high. My house sits
upon a slight elevation. There is a fence on the north side of the
house; I expect about fifteen or twenty steps—somewhere along there.
Standing in my yard, I guess I could see any one a distance of 100 or
200 yards from the house. I know I could see as much as 150
yards around. It is a fact that on the northwest and east of me is
an open country, and you can see quite a long way. I said that on
the morning of the homicide Riley Burnett and his brother Pete were
driving up stock and a stray mule. The mule came out of my pas-
ture, I think, but it may have come out of Riley Burnett's pasture.
There was a mare and two fillies belonging to Hanson. I think they
were driving them in the cow pen to get the mule out. I think it is a
fact, when Riley Burnett was driving the horses and the mule up to
my lot, that Alf Miers got a rope from the house and walked down to
where they were. Charlie ran up and opened the gate, and the horses
came in. Alf was standing on the porch, and he got his rope and
started down to the lot. Charley went in the lot, and, I think, caught
the mule. Alf went down with a rope to catch him, and they took
the mule out of the lot to the gate, and hitched him. Riley arrested
Alf there at the gate. The mule was not tied with the rope that Alf

furnished, because I think they had a bridle, and Charley had caught the mule before Alf got up with the rope. Riley and Pete Burnett were both there when Alf carried the rope down. I think Riley had a rope of his own to catch the mule with, but I would not be certain. After the mule was tied he said to Alf Miers, 'I arrest you;' and Alf replied, 'What for?' Riley said, 'For burglary in Shackelford County;' and Alf asked him, 'Have you any papers for me?' Riley replied, 'No, I have not got any, and don't have to have any.' I think that was what the conversation was. Then Alf said, 'You won't take me off before breakfast?' and the officer replied, 'I will furnish your breakfast for you.' At that time Alf Miers was bareheaded. They started on back to the house. Alf Miers was ahead of them, and Riley and Pete after him—right behind—and I was just behind them. I could not tell you who they were all that were out there, but Charley was out there for one, and myself and my wife; but I could not tell you who else was there. I could not tell you whether they were in hearing distance or not. I think they were around there. I did not see Alf when he went in at the south kitchen door. The first thing that attracted my attention was that I saw Riley with a gun, walking across the porch. He had a gun this way [indicating], walking along with the gun. The gun was a Winchester. I do not recollect whether he walked off the east end of the porch or not. I do not know whether he went over the south or the east end of the porch, and do not know whether he went round there and came to the south side of the kitchen door, as I did not see him. I did not see him when the gun was fired. I was on the west end of the porch. If he had been here [indicating southeast corner], I could have seen him if I had looked for him. The corner of the house was between me and him when the gun was fired. There is nothing on the east end of the porch to obstruct my view. The gun went off, but I can not tell you whether he disappeared around the corner of that east room or not. I did not see, and I was not paying any attention. After he disappeared from my sight I did not see any one. After he disappeared from my sight I heard the report of the gun, like he was coming around the other end of the house. Alf Miers had been at my place some two or three weeks. He was all around the country, back and forth, and helped the neighbors thresh. Riley Burnett's place is about a quarter of a mile from my house. It is just across the hill. There is a little hollow between him and me. I saw Riley Burnett the day before this killing. He had come up to my house. He did not ask me where where Charlie Metker was, but I told him he was out on the hill. I told him Charley was there, and George, and maybe I told him Alf was there. I do not know that I said any particular 'Alf;' I just said 'Alf.' I think they were in my sight at that time; that is, they were just under the hill. They were catching the calf."

Redirect examination: "Alf Miers is my wife's half brother; at least that is what his mother said. I do not know exactly where I

stood when the shot was fired, but I think I stood on the end of the porch somewhere; I believe it was the west end. I do not know where Riley Burnett was standing when the shot was fired.''

Mrs. Metker testified: "I am a sister of this defendant. I know Riley Burnett; or rather, I did know him. He died at our house, in this county and State. I suppose he died by his being shot. It was in the morning; it was pretty early in the morning, but I do not know exactly what time it was. I was there about the time of the shooting. I had staid at my daughter's on the same place, a little distance from my house. Riley had got over to my house pretty early that morning. When I got to the lot, Riley Burnett, Pete Burnett, and Alf Miers, and my boys Charlie and George, and the old man, were all in the cow pen. I had not been to the house before I went to the lot. I will tell you what happened between Riley Burnett and Alf Miers in the lot. As Alfred came out of the lot, Riley says: 'Miers, I have to arrest you.' And I believe Alfred says, 'What for?' and he says, 'You are charged with burglary in Shackelford County.' Alf asked him for the papers, and he said he did not have any papers, and that he did not need any. Alf then says, 'Let me go to the house and get my breakfast, won't you?' I do not remember what was said before that; if there was anything said, I do not remember it. He says to Riley Burnett, 'You will let me go to the house to get my breakfast?' and Riley says, 'I will give you your breakfast somewhere else.' But he finally consented for Alfred to go to the house. Alf was dressed in his pants and shirt when he came out there in the lot. He did not have any coat on, but I could not say about his hat. I do not remember whether he had a hat on or not. They were all in the lot when I came up there. I left the lot to go to the house right after that. It was a mighty short time—you might say right straight—that Riley stated that he would have to arrest him. They passed a few words, and went on to the house. Perhaps it may have been about five minutes, or somewhere about that, before they went to the house. They all went on to the porch there—to the west end of the porch— and Riley stopped there at the door—somewhere about the door—of the west room, and Alfred went on into the kitchen. Alfred just walked into the kitchen, and I was there about the door of the kitchen on the south. I started in there to give him his breakfast. He went in front of me going into the kitchen. I was by the porch in the south, near the kitchen. I was right in there close to the door, but I was not right in the door. My little girl was in the kitchen. She came running out behind me. Her name is Ida. I never went in there any further. I saw Riley Burnett. He went running across the porch from the west end, with the gun in his hand, and before he got off the porch he threw the gun up to his shoulder, and went around the corner on the east, out of my sight, and I heard him say, 'Now I will kill you,' or, 'I will kill him,' but I could not say positively which he said. I heard the gun fire. I say I heard him say what I have

just stated.   He went around the corner of the east room, out of my
sight, and then I heard a shot.   He came by me on the gallery, and
then he came back round there—Riley did—and he said to some one
of them, I do not recollect who it was, 'I am shot,' and I believe the
old man took hold of his hand, but I would not be positive about that.
I think they carried him into the house, and laid him down on a pallet.
I went in there myself and fixed the pillows under his head, and I
bathed his face with camphor, and did all I could for him until the
doctor arrived.   I do not know just exactly how long he lived, but
think between two or three hours.   I have stated to the jury all that I
heard said, and I state again, that as he disappeared around the east
corner he says, 'Now I will kill him,' or, 'I will kill you.'   I would
not be positive which he said.   I do not know the first time that I
stated this fact; I do not remember of ever stating it to anybody.   I
testified before the grand jury, but I do not know whether that ques-
tion was asked or not.   I do not think I stated that to them, for I do
not think the question was asked me.   I do not think I testified to that
fact on the habeas corpus trial of my son George, because I do not
think I was ever asked.   I was not asked to tell everything I knew on
that trial, and this is the first time, I think, I have told everything I
know about it.   I think Ida was there on the gallery at that time, after
she came out of the kitchen.   I do not remember whether there was
any one else on the porch just at that time.   As well as I remember,
my husband was between the cow pen lot and the house.   I do not
know where Pete was; I do not know where Charlie Metker was.
George had gone to the well after a bucket of water."

Cross-examined:   "When I first saw Riley Burnett with the gun,
he was standing in the west room on the south, with the gun in his
hand.   Alfred went on into the kitchen, and I started in there to give
him his breakfast.   Riley ran lengthwise of the porch and went east,
down towards the kitchen, ran around the kitchen and said, 'Now I
will kill you,' or, 'Now I will kill him.'   I never shot a gun in my
life, but I just thought he aimed to shoot Alfred.   He had it at his
shoulder, just like he was going to shoot.   About the time he turned
the corner, he said, 'Now I will kill you,' or, 'I will kill him.'   He
was somewhere on the porch when he threw a cartridge into the Win-
chester.   Before he lit off the porch, going east, he threw a cartridge
in the gun, and before he got out of my sight he had it to his shoulder,
and as he disappeared around the corner I heard a report of a gun.
The report of the gun sounded like there was not more than one re-
port, but it was a long fire.   They must have both gone off about the
same time.   It was a long fire.   It was a long, continuous roar.   After
the report, Riley Burnett came back around the house, walking—
somewhere betwixt a walk and a run—and he came up on the porch.
He was still on his feet.   He had not been on the ground.   He was laid
down on a pallet in the west, or front room, and I gave him a woman's
care and nursing, trying to do all I could to assuage his pain, and as I

said before, while we were waiting on the doctor I bathed his face, and when the doctor came, Alfred told the doctor not to let Burnett die. After the shooting, I first saw Alf when he came there to the door of the kitchen, in the south, the door that he went in at; that was where he was when I first saw him. He was by himself when he came there to the door. I heard him say he was wounded, and he said his arm was broken, and that he was shot through the heart. He told me more than once that he was shot through the heart. I do not think, from what he said and did, that he expected to live himself. He was suffering great agony and distress. This was a very short time after the shooting. He stated 'he had shot because he wanted his liberty.' That is all he said to me about it, I believe. He said he had to shoot, because Burnett was going to shoot him, and did shoot him. He did not say that he shot for any other purpose, except that Burnett was going to shoot him. At the time the defendant made this statement he was suffering great distress in mind and body. Under the circumstances stated, Alf Miers did say to me that he had to protect himself. Alf said that he had shot, because he had seen that he had to defend himself. He said that Burnett came running around the corner with a gun to his shoulder, and all ready to shoot. I had seen the wound on the defendant's breast at that time, and had also seen his arm wound at that time. They were both bleeding very profusely. It looked pretty large to me, the wound did. I was 49 years old yesterday, and the defendant is 23. Miers did say he had to shoot to protect himself."

Miss Ida Metker testified: "I knew Riley Burnett, and I also know Alf Miers. I have known Alf Miers about three weeks. I remember the day that Burnett died. Just before the shooting I was in the room getting breakfast. Alf Miers came in the room, but I did not pay any attention to what he did when he came in. I did not do anything; I just went on getting breakfast. Alf did not stay in the room; he just went out doors. He went out of the east door. He took a gun with him when he went out. It was his gun, but I do not know where he got it. I do not know where that gun was before he came into the room, and I had not seen it in a day or two. I do not know where he kept it. I went out of the kitchen to hunt mamma. It had been just a little while after Miers went out of the east door and out of the south door on the gallery that I heard the shot. I never did see Riley at all. My mother was standing on the porch, and I was standing by her. That was on the east end. When Alf came into the kitchen door he did not say anything, and he came in a walk. He never said a word when he went out. I saw Riley step off the porch. I do not remember whether I stated that on the morning in question Alf's gun was in the east room, hanging on the bed; I do not remember whether I stated it or not. I did not state that Alf got his gun and ran out the east door. He did not run; he sort of went in a walk. I do not know that I stated this at my brother George's trial."

Cross-examined: "I am 14 years old. I was 14 last February, but I do not remember how old I am for certain. I was raised in the country, and born in this county. I stated that Alf Miers came into this [indicating] south door, east room, and I saw him take his gun and go out of that door, but I did not see any more what became of Alf. When he walked out that door I walked here on this porch, and staid right by my mother. I told the counsel for the State, that when I got out there I saw Riley Burnett running around the east corner of the house. Counsel for the State did not ask me what Riley was doing, or whether he had anything in his hand, but he did have a gun in his hand. He had it up to his shoulder, and he did have it in that position when he went around the house. Just after he got round the house, with the gun up to his shoulder, they shot."

Redirect examination: "I did not hear anything said by Riley or by Alf as Riley went around the east end of the house, only I heard Riley say, 'I will kill him,' or, 'I will kill you.' I thought I heard him say that."

William Charley Metker testified: "As near as I can recollect, it was a couple of weeks before the shooting that Alf Miers came to our house. He did not bring anything with him, only a horse and saddle, a few clothes, and a Winchester. My mother was not living at home then. My pa, sister Ida, and myself composed the family. Alf staid out there at my father's, and he generally slept in the east room, in the kitchen. I never paid any attention to where he kept his things. I know where Alf slept the night before the 2nd of August. He slept in the pasture on the side of the hill, right northwest from the house. He had his gun with him. I suppose I first saw Riley Burnett about an hour by sunup. He was driving some horses, and his brother, Pete Burnett, was with him. He was driving them up to my father's to lot them. There was a stray mule with the horses that he wanted to catch, and that is what he was driving them up for. Me and Alf, and mother and George, were in the lot at the time, and pa was milking the cow. After Riley caught the mule, he told Miers that he had come to arrest him, and Alf said, 'All right.' Then he wanted to go to the house and get his things, and Riley told him he could not go to the house and get the things. Alf never said anything, but only told George to go to the house and get them for him, and George went to the house. He was gone about five minutes, I suppose, and he brought his hat and shirt, I believe, out to the lot, and then Riley gave up to him to let him go to the house. They walked up, and they stepped on the porch. Alf was ahead of Riley, and he passed by George's Winchester lying on the porch, and when Riley stepped down to pick up the Winchester, Alf ran in the kitchen and went out to the door, and the shooting took place. I was standing on the porch when the shooting happened, about the middle of it. [Witness is here asked to mark on the diagram where he was standing, which he does.] My mother was standing in the east kitchen door, or the south kitchen door. I mean

by that, she was standing in the door. My sister Ida was in the house cooking breakfast, and she was there in the kitchen when the shot was fired. Alf had gone into the south kitchen door, and Riley picked up that gun and went on the porch to the southeast corner of the kitchen. Riley was standing about that [indicating] close to the kitchen door. [Witness here marks diagram.] He was in my view, and that [indicating] is where Riley Burnett was standing. Riley Burnett had not gone round the corner out of my sight. Riley was not doing anything when the shot was fired, and he only walked back to the porch. At the time Riley, or rather the gun, was fired, Riley had the gun up to his shoulder, I suppose. Well, yes, sir; I saw him have it there, but I did not see Alf Miers, and I did not hear anything said by either one of them. I do not know where Pete Burnett was at that time. I know where George's gun was when I left the house that morning; it was under the bed in the kitchen. When we all stepped on the gallery that morning, it was lying on the porch by the south window in the west room. It was lying right down on this side of the window [indicating]; the gun was; yes, sir, it was. I know where Alf's gun was. It was hanging on the bed post in the kitchen, in the east room, in the scabbard. The night before this night, Alf slept out; he had slept out there once before that I know of. He and George had slept out in the yard together. There were not two shots fired. I do not know whether Miers was expecting arrest or not. I do not know that I ever heard Miers make any threats, only that I heard him say that no officer could arrest him any more. Riley Burnett was a constable. I never heard Alf Miers make any direct threats against Riley Burnett. Before this morning in question, the last time I saw Riley Burnett was the evening before. My brother George, Alf Miers, and Webb Walker were together, and we were on the east side of the house, by the hill. I do not know that he ever saw Alf before that afternoon, of my knowledge. I do not know that he saw him that afternoon. I know that he saw him that evening. We were not together very long after Riley came up. When Riley left, he went off northeast from our house, towards his home, and we all went back to the house. I have seen those guns before. That is Alf Miers' gun [indicating], and the other is George's. I know how that hole got in the stock, or body. It got there when Alf shot at Riley. The ball hit there, and glanced off and hit him (Riley). Riley Burnett was standing just this way [indicating], with his gun to his shoulder when I saw him before the shooting. He had it to his right shoulder."

Cross-examined: "I lived principally at Riley Burnett's house, but I do not know that I was considered a member of that family. I never did hear Alf Miers threaten to do Riley Burnett any harm, and I do not know whether Alf Miers was expecting to be arrested or not. I do not know that Alf Miers knew what Riley Burnett's official position was. I do not suppose he did. Yes, he knew he was a constable. I know he knew it, because George told him a day or two before, when

Riley had come up there.  I heard George tell him that Riley Burnett
was a constable.  I state again, that George told him that Riley Bur-
nett was a constable.  The evening before the homicide, George, Webb
Walker, and Alf Miers, the defendant—my uncle—were all down
there on the side of the hill, close by home, playing with a yearling,
and Riley Burnett came up there and I called his name, Riley, and he
spoke to me.  As to the arrest, I think the affair took place this way:
Alf was walking out of the gate and Mr. Burnett says, 'Alf Miers, I
arrest you.'  Then Alf Miers responded to him, 'What for?' and Ri-
ley says, 'For burglary in Shackelford County.'  Alf asked him if he
had any papers, and I believe Riley responded something like this, 'I
have none,' or 'I don't have to have any,' but I am not certain, as I
never understood quite what he did say.  I did not hear Burnett say
to him, 'I am a constable,' and 'I arrest you;' and I did not hear him
say, 'I am an officer.'  I admit that my mother was out there, and also
my father.  I said, and still say, Riley Burnett got that gun on the
porch by the south window of the west room, on the outside; it was
lying on the porch floor.  I told the jury before dinner that the de-
fendant walked by that gun, over it, and proceeded towards the east
end of the house.  I do not know exactly how far ahead of Riley Bur-
nett he was, but not so powerful far.  The defendant passed the gun
on the porch as he was going east to the kitchen, and Riley Burnett
was in the rear about ten feet.  The defendant did not pick the gun
up, but I suppose he saw it there.  He could have seen it if he had
looked.  I was walking right along behind Riley when they went up
on the porch.  The defendant was ten feet ahead of the whole bunch;
that is, he was that far ahead when he stepped on the porch.  He was
walking along.  I did not see him last when he entered the south
kitchen door.  Riley stooped down to pick up that gun, about ten feet,
or hardly so far, ahead.  He did not start to run until after Riley
picked up the gun.  Riley Burnett had his pistol on at that time, too,
but his pistol was not in his hand.  When Riley Burnett threw that
cartridge into the Winchester he was right by the second post on the
west end of the porch, about eight feet from the west end.  There is a
door that leads into the west room from the porch, and there is also a
window.  I said the gun was right here [indicating window of west
room], by the window.  Riley picked up the gun by the window, and
he came by the way of the second post, and as he did so, he threw the
cartridge into the gun as quick as he got hold of it.  I said he threw
the cartridge into the gun as soon as he picked it up.  He struck off in
a sort of fast walk, and was going towards the east end of the house.
He threw the gun to his shoulder after he had crossed off of the east
end of the porch.  It was about nine or ten feet from the east end of
the porch to the east end of the house.  I guess it is about that.  I
never measured it.  As he got off the porch he threw that gun in an
aiming position and got right round the corner, and as he got to the cor-
ner they both fired, and I saw him pull the trigger of his gun.  That is

not the first thing I saw when he got to the end of the house, because I saw him have his gun to his shoulder and had his finger on the trigger; but I could not swear whether I saw him pull the trigger or not. He was about two feet from the corner, standing opposite there a little piece, and still kept in my view. I did not know Miers was shot until he came there from round the house. I saw him where he was shot, after he came from round the house. I do not know whether the defendant had got into the kitchen door before Riley had thrown a cartridge in the gun, as I never paid any attention to it. I was watching Riley Burnett about as much as I was watching any of them, and I do not know that I was watching both of the parties to the shooting. Riley threw a cartridge into the gun about a minute before the shooting took place, I reckon. I said I did not know whether there were two shots fired or not, until I saw that Miers was shot; I could not tell from the report. When Alf said no officer could arrest him any more, I do not know whether he was talking about Riley Burnett; but this was of course before the killing. He did not say who he was talking about. This talk occurred about a week, I suppose, before the shooting."

A. J. Burnett testified: "They call me Pete Burnett, and I am kin to Riley Burnett, the deceased. I am a half-brother. I staid all night with Riley, and was with him early in the morning. We got up about sunup and went and saddled our horses, and went half a mile, or maybe three-quarters, to drive some horses to Metker's lot. Riley saddled his horse and staid at the house during the time I was gone, and I do not know what he was doing while I was gone. After I came back we drove the horses to the lot—Metker's lot. We went over to Miers' house, or rather to Metker's house, to arrest Meirs. Meirs was coming from the house when I first saw him. He had a lariat in his hand. I could not tell you who was at the lot, but all of Metker's family were, and Miers. I do not know that I remember the names. There was old man Metker, Mrs. Metker, George Metker, Charlie Metker, Ida Metker, and Webb Walker. Ida was at the lot the first I saw of her. Well, I will tell what happened. We drove the horses into the lot. We had a mule bunched we wanted to catch. We put him into the lot, and caught the mule and led it to the outside of the fence. Miers was standing in the lot. Riley was on the outside just a second or so, I do not know how long, and says, 'Mr. Miers, I have got to arrest you this morning,' and Miers says, 'All right,' and walked outside. Miers wanted to go to the house to get his breakfast, and Riley said he had not had breakfast yet, and they would get breakfast together, and said he would get his breakfast all right. Then Miers wanted his hat, and Riley said for George to go and get his hat, and Miers told George to go and get his hat. George went to the house and got his hat, and come back and brought it. Miers still insisted on getting his breakfast, and Riley says to him at last he could go, and says to me, 'Come up there with me;' and I told him all right, we would come with him. We went in on the porch. Miers was a little ahead of me, in front of

me, and George and I were walking along behind him, and as he walked along the porch there was a Winchester lying right in front of the door—the south door in the west room—and Miers and Riley walked over it. Miers came out over it, and when Riley came to the gun he picked it up and made this remark, 'I will get this out of the way;' and old man Metker says, 'It ain't loaded,' and he [referring to Riley Burnett] threw it—that is, the muzzle of it—to the floor, and threw a loaded cartridge out of it. I suppose the defendant might have heard the noise. When the lever of the gun clicked, Miers made a break to the south door of the east room, grabbed his gun, and ran out to the east door of the east room, and Riley ran to the corner of the house, and there was where the shooting was done. I was standing off the end of the porch, but I could not see Miers. I saw Riley. Riley was standing on the south corner of the house when the gun was fired— maybe four or five feet from the corner of the house, but I do not know just about how far. Riley was in view of those on the gallery, and when the shot was fired, Riley had his gun to his shoulder—to his right shoulder. Riley turned after the shooting and started back towards the porch in a fast walk, and I think Miers started to run from him as he came to the corner of the house where Riley was standing. I heard Miers hit the floor. I went back to the south door of the east room, and there I met Miers, and Miers said, 'I will give up; don't shoot any more; I am broken down.' I then got Miers out in the yard, and as I got Miers out I could see the blood running from his wrist and arm. Riley went back to the house. This was in the morning, between 6 and 7 o'clock. Riley was a left-handed man, but he shot from his right shoulder that morning. I do not know how many shots were fired. I could not tell, but I guess there were two. Riley lived about three hours after he was shot. After the shooting I walked Miers around in the yard. He said he had to go in the house, and asked me to let him lie down, as he was sick. I was in the room with Riley a short time after I had taken Miers in the house. Riley never said anything to me about the shooting or the cause of it. Out in the lot there, where Riley said, 'Mr. Miers, I will have to arrest you,' Miers' reply to that was, 'All right.'"

Cross-examined: "We had driven some horses up there that morning from Riley's pasture and put them in Metker's lot. I have detailed what took place down there, but I have not told everything that was said. He asked him what he arrested him for, and he told him he was charged with theft and burglary. Then Miers says, 'Have you any papers for me?' and my brother says, 'I have not got any; I have authority from Webb and Bolick to arrest you.' That is what my brother said. I was ten or twelve feet from him. When they went up to the house, and Miers had just gone into the house, my brother says: 'I will take up this gun;' and just as soon as Miers heard the click of the lever of the gun he went in the house. I do not know where the cartridge is that was thrown out of the gun. Miers got a move on

him, ran into that door, and I saw Miers get his gun.   I do not know why I did not tell that before on the habeas corpus trial.  I was standing at the door of the porch.   I do not know that he went back, or rather moved toward that door going east away from my brother. When I saw Miers running for the east door of the kitchen, then it was that my brother threw a cartridge in the gun, and he did not much more than stop to shoot.   He threw the gun to his shoulder just about the time he stopped.   Before Riley Burnett got to the east corner he was moving pretty lively.   He had the gun in his hand about that [indicating] way.   As he stood on the corner, he threw the gun to his shoulder and fired.   The acts of getting to the corner and throwing the gun to his shoulder were simultaneous with the firing.   I heard one report; that is to say, I could not tell any difference in the character of the gun; it sounded like one gun.   I never heard my brother say anything, but he just ran around and fired, and I do not think he could have said anything without my hearing him.   I did not hear my brother say a word, and I think I was nearest to him.   I was standing a little bit east of the door.   It would not be on the ground, but at the end of the porch.   Immediately upon the firing, my brother came back towards the porch, and I went towards the corner of the house where he was standing.   I heard the defendant hit the floor.   When I say about hitting the floor, I mean to say I heard his feet hit the floor.   I ran with a pistol in my hand, but he says, 'I will give up; do not shoot me; my arm is broken.'  He did not tell me he was shot through the heart until I got him out in the yard of the house.   He had a hole right above the neighborhood of the nipple.   There was a large wound there, somewhere about the left nipple.   He did not bleed so very much, but he bled some from the wound.   My brother did not say one word about the shooting, and I was with him until he died.   I was not always in the room with him all the time.   I guess I walked Alf Miers around about ten minutes in the yard.   He said he was sick, and wanted to lie down."

Ben Cabell testified: "I have seen that paper [paper purports to be a capias from Shackelford County].   I got it through the mail, with letter accompanying it, from the sheriff of Shackelford County. When I got the paper, I told Mr. Webb and Mr. Bolick to execute it. The gentlemen mentioned are deputy sheriffs.   I remember the date I received that paper; that is, my docket will show that; I know from the docket the exact date.   It is now down stairs.   The clerk keeps that docket, but I believe at this particular time this particular entry is entered in my own handwriting.   Having looked at the book, I can now remember exactly the date I received it, but I don't remember the exact time.   I know it was received the day it was docketed, and that was the 30th of July of this year.   The first thing I heard of this killing was the day afterwards.   I think Mr. Bolick and Mr. Webb had gone out there to execute the capias against Miers.   It was the day of the old settlers' picnic at Farmer's Branch, if it is the shooting

you are talking about. I got a telegram from Mr. Pemberton the morning Riley was killed, and I went there as fast as I could go. I think I got to Farmer's Branch about 11 o'clock. No; it must have been nearly 12 o'clock. I met Miers and Duke at Mr. Foster's. The first talk I made to the defendant, I did not warn him that whatever he said would or could be used against him. I warned him after that, and the talk he made after that was when I went down with Chief of Police Arnold, and we took the gun with us. At the time myself and Arnold went to the jail to see him and talk with him, I warned him in the presence of Arnold. I told him that he was a prisoner, and that any statement would be used against him. That was just about the extent of it. I told him that it would be used against him, or could be used against him. I told him he need not make a statement unless he wanted to, and it could or would be used against him. I think I had warned him, but I could not tell you the exact words. I told him that if he made any statement it would be used against him. I think I have told you that I gave him full warning, but I might not have said that it could not be used for him. When I was asked by the county attorney to give the extent of my warning, I might have used the expression that anything he said could not be used for him. I told him that anything he said would be used against him, but whether I told him it would not be used for him I do not know. I might have said it. I will state that I did say, he showed me the position of himself and Burnett. He had Mr. Arnold to stand over on one side, as representing Burnett, and he showed me how to stand as representing him, and that he shot left-handed. The long gun was the gun that Burnett had; at least, that is what he said. I think he said he had the gun up this way [indicating], but I would not be exactly certain myself. That refers to the way Miers had his gun. He said Burnett had his gun up to his shoulder. He made a statement as to the shooting. He said he could not tell who shot first; that they were so near together that he could not tell. He said he attributed this shooting to this man's carelessness with him. To use his own language, he said, in reference to the shooting, if it had not been for his carelessness it would not have been done. I suppose he referred to Riley's carelessness. He said that his carelessness was what did it."

Cross-examined: "I have stated all that he told me after I warned him. I think he made some statements to me before I had warned him, but those I have not told. He did not tell me, after I had warned him, that as he stepped out to the door Burnett had his gun down on him, and that he (Miers) had his gun down in his left hand at that time. I do not remember whether he said Burnett had his gun to his shoulder or not, but I think he said it was very close to his shoulder. We were arguing about it. He said it was up to his shoulder, or very close to his shoulder; he said he thought it was up to his shoulder. I think this statement that I have detailed in reference to the shooting happened about the second day after the shooting. It was while he

was lying in jail, and it was the first or second day afterwards. It was the same day I brought Arnold down. I expect he was suffering, and I think he had me to raise him around. Yes, sir; his arm had been put in a sling, and I think he got up in a sitting position while the chief of police of this city and myself were arguing about it, so that he could point it out. He said that the shots went so close together that he could not tell who fired first. I don't think he told me that Burnett had the gun near his shoulder. He said it was all done so quick they just ran together and they both shot about the same time. I do not recollect that Miers said, that when he first laid eyes on him (Burnett) that he had a gun on him (Miers). I do not say that he did not say that, but I don't think he said it. Except about the position, the only thing he said about it was the glancing of the ball; that is the only thing said at all. There was very little talk made by him except about the position of the guns and a glancing ball, and that they both shot about the same time. He explained about him shooting left-handed. If a man had a gun to his shoulder he would have it pretty well in a shooting position, aiming down the barrel to shoot. This defendant at the time I speak of was in a very nervous condition, but I could not tell you to what extent he was suffering. I made no attempt to have much talk with him, and there were very few words said. We got to discussing it, and he asked me to raise him up in bed, showing us about the position of the parties. He seemed to be in a very good humor. I did not attempt to have much talk with him, and I did not go down there with the chief of police for the purpose of plying him with questions. Well, I do not know my purpose in warning him, except that what he said would be used against him. I do not know that he called me voluntarily to his couch. I can not think that Miers asked me to go, but Arnold wanted to ask him questions about whether he had been arrested before. This entry on the book, you can judge for yourself whether it has been made twice. It might have been put there in the first instance in error, and might have been changed. It is not the only thing on this page that I detect has been changed. This here [indicating] is my writing. I just recorded this myself. It might have said the 29th day of the month first, and then the 30th afterwards. I know it is intended for the 30th, and that it was a mistake; that it was made at the time and rectified at the time. There are two entries of mine on the same day."

The State then introduced in evidence the capias from Shackelford County for the arrest of Miers for burglary.

Mr. Webb testified: "I have seen that capias before. The capias was put in my hands the preceding evening, the day before the shooting. That was on the 29th day of July; that is, I think it was on the 29th day of July. I put it in my pocket, and Bolick and I went on the other side of the river to hunt him. We first went to Eagle Ford and inquired about him. We did not hear anything about him there, and went up to Bear Creek, and from there we came on over past Mr.

Riley Pemberton's place. We got there about 2 o'clock that evening. We saw Riley Burnett that evening. He came to Mr. Pemberton's while we were there, about 4 o'clock that evening. I asked Riley if he knew him, and he said he had seen him once or twice. He said he had been there about an hour before that. I told Burnett to arrest him, and I gave him the capias, and he started off. He came back and gave me back the capias, and said I might need it myself, as he was down on West Fork [referring to defendant]. That was about an hour by sun the evening before the shooting. Riley Burnett was constable of precinct number 8."

O. Metker testified: "Alf Miers did not say in my presence, or in my hearing, that no officer could ever arrest him any more, and he never said anything about any officer in my presence at all."

Cross-examined: "I never heard him say it. If he did say it, he never said it in my presence."

Mrs. Metker testified: "Alf Miers never did, in my presence, or in the presence of my husband, daughter, or Charlie Metker, say that no officer could arrest him any more, or anything like that."

Miss Ida Metker testified: "Alf Miers never did in my presence, or in the presence of my father, mother, or brother, say that no officer could arrest him any more."

George Metker testified: "I did not see the shooting. I was between the well and the house, coming from the well. I reckon it was about thirty steps, as well as I recollect, and it is on the west end of the house. It was on the opposite side to where the shooting took place. As I stated before, I did not see the shooting. I went off to the well to get a bucket of water. I did not see the shooting, but I heard it. I was about half-way back from the house when I heard the shot. When I heard the shooting I dropped my bucket and ran to the house. Riley Burnett was on the west end of the porch, but I do not think I saw Alf Miers. The next I saw of Alf Miers was out in the yard. He was in the west part of the yard, on the west side of the house, and he was with Pete Burnett. They were standing together on the ground. They did not change their position after I saw them, but just simply stood there. They only staid in the yard just a few minutes, and I think Alf told him, or rather Pete told me, 'Let's take him in the house and lay him down.' We took him in and laid him in the east room on the bed. Riley Burnett died on the bed in the west room. He died on the north bed in the west room. This partition here [indicating] is made of logs. Some of them are six inches wide, and some of them are two inches wide. We put Miers on that bed there [indicating]. The partition wall would separate the two beds; that is, the one that Alf was on and the one that Riley died on. I guess they were about that thick—about five inches. A fellow could not have seen anybody in the east room very well if he had been standing up there by the wall and looking through the crack, but there was nothing in the cracks to prevent any one seeing through. I do

not remember how long the partition was. The logs were about thirteen or fourteen feet long at the start. Alf's head lay about here [indicating]. We had some pillows under him to sort of hold him up. There was nothing to prevent any one from being heard, and he could hear what was said in the other room by parties there. Alf talked to me some before the doctors came, about fifteen minutes, as well as I recollect, after the shooting. It was about the time he was talking to my mother. It was before the doctors came. It was a few minutes after I went in the house. I will state what he said that Riley Burnett was doing when he (Alf) got out of that east door. He said Riley had him covered with his gun when he stepped out of the door. He said he shot to save his life. At the time he made this statement he was pretty weak, and was bleeding right smart. He told me at that time that he was shot through the heart. He did not say whereabouts he was shot, but I looked at his arm and I saw that he was shot there. When he said he was shot through the heart, I saw the blood up there on his shirt, and I took hold of his shirt and saw where the ball had gone through, and looked at the hole. The hole looked large enough for me to come pretty near able to stick my thumb into it. He said he was shot through the heart when I first went to him in the yard. He did not say anything to me about living, but he said, 'Boys, pull off my boots. I always said I would die with my boots off.' I pulled one of them off, and he (Pete) pulled the other. The last time I saw Riley Burnett before the shooting was the evening before the day he was shot, and it was about sundown. It was east of the house, like; 'sorter' northeast of the house, under the hill there. There were my brother Charlie, Alf Miers, and Webb Walker with us, and we had a yearling there, and were tying a can to his tail to have some fun. I do not think there was anybody had a gun in the crowd. He (Alf) was in his shirt sleeves and was barefooted. We had just turned the calf loose, when Riley Burnett rode up, and he said 'Howdy, boys?' and I said, 'Howdy, Riley?' He did not stay there any length of time—only a few minutes—and when he left he went in the direction of the northeast. He was in pa's pasture. The road he went off led him towards where he lived. Webb, Alf, Charlie, and myself started to the house after he left, and we got up pretty near to the house. All four of us did not go to the house; only Alf, Webb Walker, and myself went to the house. There was some threshing of wheat done in the neighborhood there, and I knew the defendant had done work of that sort, because he helped the Walker boys thresh oats. I suppose their house is about a mile and a half from my father's house. I knew he was in Dallas during the time he staid at my father's house. He helped Webb Walker, John Ervay, and myself drive some cattle to Dallas. I do not remember that I ever told Alf Miers that Riley Burnett was a constable. If I did I do not recollect it, and I have no recollection of saying anything like that whatever. When I got back from the house that morning with Alf's hat, Alf asked the officer to

let him go to the house and get his breakfast. I never heard him say anything else, and I did not hear anything said about papers. I was only gone a few minutes to the house for the hat. I could not tell you when I last saw my gun, and I had not had it that morning of the killing. I do not know where my gun was that morning of the killing. I do not know who put it on the gallery, and I did not know it was on the gallery. I was indicted as a principal in the murder of Riley Burnett."

Cross-examined: "I do not know exactly how long I had known Riley Burnett, but I had known him a long time, and I liked Riley Burnett very well. He was a good man. He came to the house he was living in last spring a year ago. He had been constable out there just since the last election. The first time I saw Alf Miers was a long time ago, and the second time I saw him was about two or three weeks before the shooting. He brought a horse, saddle, and gun with him. He did not keep the gun in the east room. Yes, he did, too; he kept it in the east room hanging on the bed-post, in a scabbard. He would sleep in the house sometimes, and sometimes he would sleep on the porch, and sometimes he would sleep on the bed in the house, that would be in the east room—and sometimes he would sleep in the yard. I do not know where he slept the night before; that is, not all night. I know in getting up next morning he was lying down outside of the east post. He had his gun with him. When I went to the house to get that hat I did not put the gun on the gallery. I am sure of that. I do not know where Alf's was when I went to the house, and I did not tell him where it was when I went back to the lot. I said that, when they all started from the lot to the house I went to the well, and did not walk up there with Pete Burnett, right behind Alf and Riley Burnett; and I was not standing out here on the ground, right by this gallery, when the shot was fired. Alf said to me that when he jumped out of the kitchen door Riley had him covered. There was nobody present at all when he told me that. We were in the room there together. Pete Burnett was in the room where Riley was, and that was after we had pulled his boots off. He did not talk very loud, as he was not able to do it. He was lying on the bed when he said that, and there was nothing but small logs between him and the bed where Riley Burnett was lying. Riley Burnett was lying on a pallet on the floor at that time, and he was in the next room. Nobody heard him when he told me that, and that was before the doctor came. I saw Riley's wound, and it looked like a pretty big sized hole, but it did not look hardly as big as Alf's. I have not told this about Alf's statement to me here for the first time, but I do not remember who I told it to, and I do not remember when I told it. I have been to see Alf in jail, but did not talk with him about this case. Alf, among other statements, never told me that it was Riley's own fault, and that he was 'too damned careless.' Yes, sir, I believe that is all he ever told me. Yes, sir, Riley had previously arrested me. I might know

Mr. Webb and Mr. John Bolick when I see them, but I do not know that I know his name."

Redirect examination: "The first time I saw that mark on my gun, after it was done, I suppose was the day Riley was killed. A gun is called loaded when there are cartridges in the gun, but when the cartridge is in the magazine I do not call it loaded. When I discovered that splint there, it was after Riley was shot. There is a large sliver in the inside of the stock, near the base of the stock, and ending about an inch and a half from the curve that fits the shoulder. The splint is about half an inch deep."

Dr. McCullom (recalled) testified: "I was on the witness stand the other day, and I stated that I informed the defendant that Riley was dead. When I told the defendant that Riley Burnett was dead, he said that he was sorry that he was dead, and that he would sooner have died himself, as he was a brave man, or something of that kind. I do not remember the time, as to whether it·was directly after he died. I was in the room just after he died, where this man lay. I do not remember just exactly. As soon as he was informed, he made that reply to me as soon as I spoke to him about it. His condition seemed to be, that he was suffering great distress and agony, both mentally and physically. The wounds he received necessarily produced that sort of feeling on his part."

A. B. Wright testified: "My name is A. B. Wright, and I knew Riley Burnett in his life-time. I think I had known him twenty years. I had business relations with him. We were in the cattle business together and were associated as partners. I went over to Metker's house, where Riley Burnett was, after the shooting, and I saw Riley Burnett. Riley Burnett made a statement to me as to how this shooting occurred. When I walked up there, I said, 'Riley, are you badly wounded?' and he replied, that he was badly wounded. I asked him, 'What made you let Miers go to the house?' and he said that he out-talked him. He said Miers wanted to go to the house, and that he was a little too careless with him. He said, that when he got to the house, and Miers run in the house, 'I run around the corner of the house, and when I got around to the corner of the house Miers had got to the door; I had my gun up to my shoulder, and had it on Miers, when Miers jumped out; I did not think he would shoot me; Miers came out of the house with the gun down in his hand.' Riley said he (defendant) threw the guard down and threw a cartridge into the gun, and he just threw the gun over and shot, and he (Riley) said, 'I held a little too long.' He stated, that the defendant just threw the gun over and shot. He stated he ran out of the door and threw a cartridge in. I do not believe Burnett stated how the defendant shot at him. He said he just ran out of the door and threw a cartridge in it, and just threw the gun over, 'and we both fired at once; I held a little too long.' He said he had the gun on the defendant as the defendant got out of the door. He said the de-

fendant had just jumped out of the door and run, and that he hallooed 'Halt!' at him, and that when the defendant jumped out of the the door to run he hallooed 'Halt!' Yes, sir; he said something about liberty. He said that Miers said he just wanted his liberty. He said he did not blame anybody but himself. He said that he could not blame Miers; that if they had a writ for him that he would have tried to get away, too. He said he would have done the same thing that Miers had done if he had been in his place."

Cross-examination: "I told Riley, as a friend, when he went over there, to watch him; not to give him any advantage; and he told me that he would arrest him all right, and I told him that they would all shoot. I meant the Miers family. I told him that. I have known them for thirty years. I think that is about all I told him. Riley told me that he had time to have shot him, but did not do it. I got there, I guess, about a little over five minutes after he was shot."

Recross: "Riley Burnett was 35 years old."

*Miller & Williams* and *Stillwell H. Russell*, for appellant.

*Mann Trice*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—This is a conviction for murder of the second degree, with punishment in the penitentiary for the term of twenty-five years. The name of the deceased was Riley Burnett. The statement of facts covers seventy printed pages, when all of the material facts could have been placed in twenty pages. Alf Miers was at the time of homicide living with Mr. Metker, in Dallas County, about fourteen miles northwest of the city of Dallas. Miers was a brother-in-law of Metker. In Shackelford County an indictment was pending against him for burglary. A capias had been sent to and was in the hands of the sheriff of Dallas County (Cabell). On the evening before the homicide, Webb and Bolick (deputy sheriffs of Dallas County), Webb in possession of the capias, saw deceased, Burnett, who was a constable of said Dallas County, and requested him to take the capias and arrest the defendant. Deceased took the capias, but returned it to Webb, stating, that "You might as well have it as I." On the next morning, early, Burnett went to Metker's, and arrested the defendant. When the arrest was made, defendant asked him for what he was arrested. Deceased replied, for burglary in Shackelford County. Defendant asked him if he had any papers. Deceased answered that he had not, and did not need papers. Defendant asked permission to go to the house and get his breakfast, and after some parleying deceased consented to this. The parties went to the house, defendant in the lead, with deceased a few feet behind him. Upon the gallery of the house was lying a Winchester rifle. Defendant stepped over or passed near by the gun, and when deceased reached it, he picked it up and threw a cartridge into the barrel. One witness says that he threw a cartridge

out, but this is immaterial. When the deceased picked up the gun and threw a cartridge into the barrel, the defendant, hearing this, ran. The defendant did not run until this was done. But we will let the dying man give the facts attending the homicide. Riley Burnett, the deceased, a very short time after he was shot, gave the following version of the transaction to A. B. Wright. Wright was his friend. They had known each other for twenty years, and had been partners in the cattle business.

The following is the testimony of A. B. Wright: "My name is A. B. Wright, and I knew Riley Burnett in his life-time. I think I knew him twenty years, and I had business relations with him, as we were in the cattle business together, and we were associated as partners. We had been partners three years. I remember the day he was killed. I have known the defendant ever since he was a baby. I have not seen him (the defendant) for over ten years prior to the homicide till I saw him then. I went over to Metker's house, where Riley Burnett was after the shooting, and saw Mr. Riley Burnett. Riley Burnett made a statement to me as to how this shooting occurred. When I walked up there, I said, 'Riley, are you badly wounded?' and he replied that he was badly wounded. I asked him, 'What made you let Miers go to the house?' and he said that he out-talked him. He said Miers wanted to go to the house, and he said that he was a little too careless with him. He said that when he got to the house, and Miers run in the house, 'I run around the corner of the house, and when I got around to the corner of the house Miers had got to the door. I had my gun to my shoulder, and had it on Miers, when Miers jumped out. I did not think he would shoot me. Miers came out of the house with the gun in his hand.' Riley said he (defendant) threw the guard down, and threw a cartridge into the gun, and he just threw his gun over and shot; and he (Riley) said, 'I held a little too long.' He stated that the defendant just threw the gun over and shot. He stated he ran out of the door, and threw the cartridge in. I do not believe Burnett stated how the defendant shot at him. He said he just run out of the door, and threw a cartridge in it, and just threw the gun over, 'and we both fired at once; I held a little too long.' He said that he had the gun on the defendant as the defendant got out of the door. He said the defendant had just jumped out of the door, and run, and that he hallooed 'Halt!' at him, and that when the defendant jumped out of the door to run he hallooed 'Halt!' Yes, sir; he said something about liberty. He said that Miers said he just wanted his liberty. He said that he did not blame anybody but himself. He said that he could not blame Miers; that if they had a writ for him, that he would try to get away, too. He said he would have done the same thing that Miers had done if he had been in his place."

Now, there is not a line of testimony in conflict with this, the statement of the man who was shot, and soon after died from the wounds inflicted, by appellant. That this story is colored in behalf of appel-

lant is absolutely preposterous.   Such an hypothesis is in conflict with our experience, and is against our frail, depraved natures.   For Burnett, suffering, yes, dying, from the wounds inflicted by appellant, to tell the plain unvarnished truth, would be to approach that degree of perfection rarely to be found in a man.   This homicide was not in prevention of the arrest, which had taken place at the horse lot.   That arrest, though illegal, had been submitted to by the appellant.   The case before us is one in which a citizen, who has been illegally deprived of his liberty, attempts to regain it, and the trespasser— aggressor—who has in violation of law deprived him of his liberty, attempts by means of a deadly weapon, used in a deadly manner, to prevent him.   In this case the man falsely imprisoned did not use or attempt to use a deadly or any kind of weapon to regain his freedom.   He had his gun unloaded, down, not presented, and was fleeing, and did not charge his gun until deceased had not only presented but had covered him with his gun, when they shot at each other simultaneously, both receiving, as was then supposed, mortal wounds.

  That the arrest was illegal is not questioned.   The court so instructed the jury.   Being an illegal arrest, what were the rights of the accused under the circumstances?   Being without capias in this case, the deceased, a constable, had no right to arrest the appellant, and in making the arrest was a trespasser, and the appellant had the right to resist by force, using no more than was necessary to resist the unlawful acts of the officer.   An officer who acts without proper authority, and the person doing the same act who is not an officer, stand on the same footing; and any third person may lawfully interfere to prevent an illegal arrest, doing no more than is necessary for that purpose.   West v. Cabell, 153 U. S., 78; Commonwealth v. Crotty, 10 Allen, 404, 405. If deceased, Burnett, had no right to arrest appellant, and if in so doing he was a trespasser, had he the right to retain him in his custody? Does the fact that appellant yielded, without resistance, or without protesting against the trespass, make the arrest legal?   Does this fact deprive the man falsely imprisoned of the right to assert his rights and regain his liberty, or convert in some mysterious manner the trespass into a lawful act?   The affirmative of these questions has no support in principle or reason.   Being wrongfully and illegally deprived of his liberty, appellant had the same right to regain it, and right to use the same means, force, or resistance, as he had in preventing an illegal arrest.   Being falsely imprisoned, he had the right to his liberty, and, for the purpose of obtaining it, could use all force necessary for that purpose, taking care to use no more than was required.   What degree of violence is necessary always depends upon that used or attempted by his adversary.   To illustrate: A is illegally arrested, and attempts to regain his liberty.   His adversary proposes to prevent this by the use of deadly weapons.   A may resort to such weapons. A flees from such arrest.   The officer presents, in a shooting position, his gun, demanding of him to halt.   A can shoot, if it reasonably ap-

pears to him that the officer will shoot. But if A is unlawfully arrested, and, being in no danger of violence from the officer, resorts immediately to deadly weapons or great violence (that which is unnecessary to secure his liberty), he would not be justified or excused. He would be guilty (if he should slay the officer) of murder in the first degree if he, anticipating the arrest, should prepare himself with a deadly weapon, and deliberately and calmly form the intention to kill the officer. Rex v. Patience, 7 Car. & P., 775; Reg. v. Allen, 17 Law Times (N. S.), 222. But, express malice apart, if A should use at once, without first resorting to milder means, greater force or violence than was necessary to obtain his liberty, and should kill the officer, he would be guilty of manslaughter. The illegal arrest being a great provocation, the killing would be attributed to the passion arising therefrom. West v. Cabell, supra, and authorities there cited. In every case in which the defendant is held guilty of manslaughter, he used more or greater violence or force than was necessary to prevent the arrest or regain his liberty. If the accused used no more force than was necessary, he would be guilty of no offense. Let us suppose that the party slain (be he officer or not) was authorized to make the arrest and detain the accused. If he exercises his authority in a wanton and unnecessary manner, he becomes a trespasser, and if by his acts he creates in the mind of the accused a reasonable apprehension or fear of death or great bodily harm, the homicide would be excusable. The State v. Oliver, 2 Houst., 605, 606. If the officer has no authority to arrest, in attempting or making the arrest, he becomes a trespasser, and stands on no better ground than a third party—than if he were not an officer. The arrest being illegal, he has no right to detain the prisoner, and hence no authority to prevent an escape, and in preventing an escape he would still be a trespasser, and stand to the prisoner on the same ground as a private citizen.

All of the above propositions of law are not applicable to this case. Upon the trial in felony cases, the court must give in charge to the jury the law applicable to the case, whether requested to do so or not. What law is applicable to the case is determined by the charge contained in the indictment and the evidence adduced on the trial. To be applicable, it must have support in the evidence; and in determining the law which is applicable, the case must be clearly understood by the judge whose duty it is to apply the law. Law which is applicable to one case of homicide in preventing an illegal arrest, or to effect an escape from such an arrest, may not have any application whatever to the case on trial. Now, then, what is this case? Appellant was illegally arrested, and attempted to regain his liberty. The deceased, who was a trespasser, threw his Winchester upon him, covering him with it. Appellant charged his gun while deceased was covering him, and, he still retreating, deceased, with his gun still in a shooting position, demanded of appellant to halt, when they both shot, shooting at the same time, each receiving wounds, that of deceased's proving mortal. And

what is the law applicable to this case? The court should have instructed the jury that the arrest was illegal, and that deceased was a trespasser in making the arrest and detaining the prisoner; that the appellant had the right to regain his liberty, and that deceased had no right to prevent him; and that if deceased, to prevent an escape, threw his gun upon him, commanding him to halt, and that appellant, believing that his life was in danger, or that he was in danger of serious bodily injury, shot and killed the deceased, to acquit him. Was manslaughter in this case? It was not. Why? The arrest and detention were unlawful. Did appellant use more force than was necessary? He did not; for nothing less than the most effectual means could have sufficed, and in this case appellant's life was not saved by his prompt action, with a deadly weapon—that is, by the shot—but because the ball from deceased's gun struck appellant's gun, and was no doubt somewhat deflected. Did he shoot too quick? He did not shoot soon enough. Before the deceased threw his gun to his shoulder, and pointed it at appellant, had he done or said anything which was calculated to induce deceased to believe that he intended to shoot him, or inflict upon him the slightest degree of violence? He had not. He said, "I just want my liberty," running at the time. He was entitled to his freedom, and had the right to say so. He had the right to run, and was doing so. Was murder of the first degree in this case? It was not. There is not the slightest testimony in this record tending to prove that appellant had prepared arms in anticipation of arrest, and had deliberately and calmly determined to kill the officer. When arrested, appellant was unarmed. The Winchester on the gallery did not belong to him. He, when he could have done so, did not touch the gun. Deceased picked it up, and threw a load into the barrel, and with this gun shot appellant.

But concede, for the argument, that appellant had been breathing out threats of the most deadly character against any and all officers who might attempt to arrest him legally or without authority, such proof could not have had the slightest bearing upon this case, when considered in the light of the facts attending this homicide. Neither was murder in the second degree in this case. Why? (1) Because the killing was without malice; (2) because the killing was permitted by law in the necessary defense of the life of the appellant. We have given the statement of facts a most careful examination, and if there is any testimony in the record which places the appellant in the wrong in any respect, we have not perceived it. He may have been guilty of burglary in Shackelford County, but until tried and convicted, the law presumes him innocent of that charge.

Over the objections of counsel for appellant, the court permitted the State to introduce in evidence the capias from Shackelford County for burglary in that county. The State, over the objection of the appellant, proved that Riley Burnett was a good man. The State, over the objections of the appellant, proved by Wright, that a short time

before the homicide he had told deceased, "You have a pretty bad man to arrest; that they would all shoot." (1) Riley Burnett was not on trial. (2) The arrest was unlawful. The capias was not admissible, and served no legitimate purpose in this case, but would present the appellant to the jury as a felon—a burglar. What Wright stated to the deceased was not competent. Deceased had no right to attempt the arrest. That the deceased was a good man had nothing to do with this.

The court instructed the jury upon self-defense properly, but added the following: "And in this connection you are further told, that if you find that Burnett first assaulted defendant by drawing his gun to fire, and not to halt defendant, then the law presumes that he intended to inflict serious bodily injury or to kill the defendant." But suppose he drew his gun (which he never did), pointed it at the defendant, and called for him to halt, intending evidently to kill him if he did not halt, what would the law presume then? The law would make no presumption, because none would be needed, especially when deceased unlawfully shot the defendant. The charge was wrong. It was calculated, when considered in connection with the statement made by deceased to Wright, to induce the jury to believe, that if deceased's intention was to rearrest the appellant, he had the right to do so. That it was the intention of the court to convey this idea is evident from the following charge: "You are further instructed, that if you believe from the evidence that the defendant, Alf Miers, had submitted to his arrest by Riley Burnett, and after such submission broke away from the custody of said officer with the intent to escape from the arrest to which he had submitted, that the officer, Riley Burnett, had the right to prevent said escape." A is arrested by a private person without authority. A did not resist the arrest. A has no right to escape from such an arrest, and hence the person making the illegal arrest is vested with the authority of a full-fledged officer, armed with all proper authority, and A must go with the trespasser wheresoever he desires, and can obtain relief by habeas corpus, we suppose, if his consent has not deprived him of this right. We defy the production of a single authority in support of this proposition. Such a doctrine would be sweet to the highway robber. He would select his time, arrest his man, take him to one side for the purpose of fleecing him, and the prisoner would have no right to regain his liberty, because he had yielded to the arrest without resistance; nor could any other persons intervene, for they would have no greater or other rights than the prisoner. This charge vamps paragraph C of the main charge, which reads: "But if a person submit to arrest, and acquiesces in the authority of the officer to make the arrest, he waives every objection or right he may have made to any irregularity or illegality in the same or the arrest; and if thereafter he breaks away from the officer he acts unlawfully, and in a conflict between him and the officer consequent thereon, he, in law, would be the aggressor; and if by his conduct

[what conduct? running, we suppose], or with deadly weapons, he leads the officer to reasonably apprehend danger to life or serious bodily harm, he can not invoke the law of self-defense in any subsequent conflict.''

When we read this instruction to the jury we can account for the verdict of guilty in this case. Now, in regard to this charge, we have this to say, that it is not law, but an outrage upon law. A citizen is illegally arrested without resistance. He attempts to regain his liberty by flight. He is the aggressor if he should shoot the trespasser to save his own life—shoot and kill the man who was and had been in the very act of killing him, because he was attempting to release himself from the, in law, real aggressor.

The appellant was convicted of murder of the second degree; his punishment was fixed at confinement in the penitentiary for the term of twenty-five years. This conviction has no support in the evidence. It is evidently against not only the great weight of testimony, but against all of the evidence. We close our observations in regard to this case with the language of Messrs. Horrigan and Thompson in their note to the case of Myers v. The State, 33 Texas, 525: ''This seems to be one of those unfortunate cases where not only the plain rules of law, but the very right and justice of the case, have been violated, and, what is worse, violated against the overwhelming preponderance of the testimony, and that presumption which the law humanely indulges in favor of the innocence of every man who is put upon trial for crime.''

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

HENDERSON, Judge, concurs.
DAVIDSON, Judge, absent.