**Donald Ray FITZGERALD, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 246–87.

Court of Criminal Appeals of Texas, En Banc.

Jan. 17, 1990.

Bobby L. Freeman, Palestine, for appellant.

David P. Weeks, Travis L. McDonald, Jr., Sp. Prosecutors, Huntsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITIONS FOR DISCRETIONARY REVIEW

CLINTON, Judge.

The offense is felony escape as proscribed by V.T.C.A. Penal Code, § 38.07(a) and (c)(1) and (2) (Acts 1973, 63rd Leg., Ch. 399, p. 883, at 950.[1] The indictment here alleges that on or about the 1st day of February 1983, in Anderson County, appellant did then and there:

*intentionally and knowingly* escape from his confinement in the Beto II Unit

of the Texas Department of Corrections where he was in the custody of [named warden] when he ... had been convicted of the offense of Aggravated Robbery, a felony[.]" [2]

The indictment further alleged for enhancement two prior convictions, the most recent of which described the conviction for aggravated robbery under the sentence for which appellant was then and there confined in Beto Unit II.

The facts of the case and germane evidence adduced are summarized in the opinion below, *Fitzgerald v. State*, 722 S.W.2d 817 (Tex.App.—Tyler 1987), and in somewhat altered form we reproduce them in the margin.[3] Appellant and the State agreed the testimony of Dimsdle raised the defense of necessity, and the trial court

1. The statute denounces an offense of escape in terms applicable here, *viz:*

    (a) A person ... convicted of any offense commits an offense if he escapes from custody.

    (b) * * * *

    (c) An offense under this section is a felony of the third degree if the actor:

    (1) is ... convicted of a felony; or

    (2) is confined in a penal institution.

    (d) * * * *

    Escape means "unauthorized departure from custody[.]" V.T.C.A. Penal Code, § 38.01(3). We observe the statute does not in terms prescribe any culpable mental state, although in practice a pleader usually alleges "intentionally and knowingly." See, e.g., 3 Branch's Texas Annotated Penal Statutes (3rd Ed.1974) 126–129. For sufficiency of a charging instrument see generally, e.g., *Ex parte Carroll,* 659 S.W.2d 437 (Tex.Cr.App.1983); *Ex parte Abbey,* 574 S.W.2d 104 (Tex.Cr.App.1978); *Garcia v. State,* 537 S.W.2d 930, at 932–933 (Tex.Cr.App.1976).

2. All emphasis here and throughout is supplied by the writer of this opinion unless otherwise indicated.

3. Sometime before seven o'clock in the morning of the day alleged appellant, Wilford Dimsdle and another inmate broke out of a dormitory in Beto II Unit and cut their way through a perimeter fence. Prison officials, aided by scores of peace officers, conducted an extensive search for them. About twelve hours later some officers were dispatched to the farmhouse of Bobby C. Mayo, six to eight miles from Beto II, where, the prosecution would develop on *rebuttal,* appellant and Dimsdle allegedly had committed two extraneous offenses, and ran away. Shortly thereafter they were "treed" by tracking dogs

and captured by officers several hundred yards from the Mayo house.

As summarized in its opening statement to the jury, the State made out a prima facie case of escape by merely proving all elements of the primary offense as alleged. In other words, it did not show any acts of the escapees during some twelve hours thereafter; inhibited by a pretrial order in limine, the prosecution did not undertake to show circumstances attending the incident at the Mayo residence. However, it did prove up their capture when located by tracking dogs [II SF 71, 81].

After the State rested, through testimony of Dimsdle appellant sought to raise the defense of justification by necessity for his escape from custody. See V.T.C.A. Penal Code, §§ 9.02 and 9.22. Dimsdle related that on January 20, 1983, a corrections officer named Anderson, armed with an open knife, came into showers where appellant and other inmates were bathing, causing a "panic"—"All the inmates backed up and they were screaming and hollering." Appellant, Dimsdle and another inmate reported the incident to the federal special master "overseeing" the Department of Corrections. A few days later, according to Dimsdle, Anderson approached him and appellant because the warden had "chewed him out" about going into the shower with a knife. To appellant he said, "I knew you from Darrington, and I am going to get you." To Dimsdle he said, "I don't know you, but I am going to get you, too." Dimsdle further testified, "That was one incident, and on my own I run into him a couple of times and he would talk about something would fall off the building on me if I didn't watch myself."

Dimsdle was not asked any questions relating to facts surrounding the escape and confrontation at the Mayo house; indeed, when the State sought to crossexamine about such matters, he

instructed the jury accordingly.[4] On the theory that it refuted appellant's claim of necessity ("this again goes to their defense of necessity—that this was not an act of necessity but an act with intent to commit further felonies, which they did," the court admitted Mayo's testimony of an attempted intrusion into his home.[5] As to extraneous offenses, charged by the State as burglary and attempted murder, the trial court gave the jury an instruction in the usual form that restricted the jury to "consider[ing] the same in determining the intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose."

The jury returned a general verdict of guilty, thereafter found enhancement allegations "true" and assessed punishment at fifty years confinement. The judgment orders the sentence in this cause to begin when the sentence in the aggravated robbery cause ceases to operate.

On appeal the Tyler Court of Appeals reversed the judgment upon sustaining two points of error. For reasons stated in its opinion, the Tyler Court found reversible error during trial on guilt in admitting rebuttal testimony of Mayo describing two extraneous offenses, and during punishment in that the conviction for aggravated robbery alleged to enhance punishment was not available for that purpose because it was an essential element of the charged offense of escape. *Fitzgerald v. State*, supra, at 819–820 and 821.

We granted kindred grounds for review presented in State's petitions (one by the

---

invoked his privilege against selfincrimination. He did testify about their capture. Defense rested.

In rebuttal, over objections, the prosecution presented testimony from Mayo describing his experience. See note 5, *post.*

4. After a preliminary exposition of the law of necessity and definitions of material terms, the charge applied them as follows:

"Now if you find from the evidence beyond a reasonable doubt that on the occasion in question the defendant did escape from his confinement in Beto II Unit, Texas Department of Corrections, as charged, but you further find from the evidence, or you have a reasonable doubt thereof, that at the time of such conduct by the defendant, if any, the defendant reasonably believed that such conduct on his part was immediately necessary to avoid imminent harm, and that the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law of escape, then you will acquit the defendant and say by your verdict not guilty."

5. After an in camera hearing in which the prosecution's position and appellant's objections were thoroughly exposed and ruled on by the court, Mayo recounted that as he was returning home that evening he "noticed several people were lined up and down the road on the way to my house" (whom he did not describe or identify) and shortly after he went in something "unusual" happened, *viz:*

"A. My doorbell rang and when I went to the door, there was a fellow standing there with a knife in his hand.

\* \* \* \* \* \*

Q. What happened then?
A. When I started to open the door, he lunged at the door, attempting to come in. [identifies appellant]
Q. And what happened then?
A. Well, when he lunged at my door, I slammed the door to on him and had him held out with the exception of his head.
Q. When you slammed the door to on him, how much of his body was between the door and the door frame?
A. His left shoulder and arm and part of his head.

\* \* \* \* \* \*

Q. What happened then?
A. Well, the next thing I know, there was a another push at the door, and I knew that I was not going to be able to hold them out, so I reached for the knife to try to protect myself and my family.
Q. And what happened at that point?
A. Well, the door came open and I really don't recall anything other than a struggle. The next thing I remember is someone saying, 'Hold it, man, back off.' And everything kind of ceased and, at that time, I noticed or realized that my son had his shotgun pointed at them.
Q. Were you injured [and how]?
A. I had a cut on my right little finger and a [puncture] place on my chest.
Q. What happened when your son pointed the gun at them?
A. After the remark, 'Hey, back off,' they left [running, I suppose]
[confirms appellant as one with knife struggling with him]"

Appellant did not crossexamine the witness.

special prosecutor, another by State Prosecuting Attorney) to review reasons given by the Tyler Court for sustaining the points of error and reversing the conviction.

The first ground asserts the Tyler Court erred in that evidence of the extraneous offenses were admissible as part of "same criminal episode," analogizing *Weaver v. State*, 657 S.W.2d 148 (Tex.Cr.App.1983), and claiming conflict with *Moreno v. State*, 721 S.W.2d 295 (Tex.Cr.App.1986); to show "flight," relying on *Thompson v. State*, 652 S.W.2d 770 (Tex.Cr.App.1981); to rebut defensive theory of necessity.

The second ground urges error in that the holding of the Tyler Court that the aggravated robbery conviction could not also be used for enhancement is in "direct conflict" with *McWilliams v. State*, 719 S.W.2d 380 (Tex.App.—Houston [1st] 1986) PDR granted and docketed as our Cause No. 129–87. Having this day held the State was barred from using to enhance punishment the same prior felony conviction alleged as an essential element of the primary offense of escape, 782 S.W.2d 871, and reversed the judgment of the Houston [1st] Court in *McWilliams*, consequently we overrule this ground for review. With that, we return to the first ground for review.

Under the statute as applicable here, the core element of escape within the contemplation of § 38.07(a) was (and still is) an "unauthorized departure from custody," by a person convicted of an offense; that the unauthorized departure is from confine-

ment in a penal institution is a circumstance that makes an escape a felony of the third degree.[6]

■ Thus Appellant with his cohorts committed the felony offense of escape by moving beyond bounds of Beto II Unit without authority, and his offense was complete at that point. *Scott v. State*, 672 S.W.2d 465 (Tex.Cr.App.1984); see *Casey v. State*, 681 S.W.2d 178 (Tex.App.—Houston [14th] 1984), PDR refused, and *Eickenhorst v. State*, 662 S.W.2d 622, at 625 (Tex. App.—Houston [14th] 1983), PDR refused. And assuming without deciding that a culpable mental state of "intentionally" or "knowingly" is nevertheless required pursuant to V.T.C.A. Penal Code, § 6.02(c), at that point appellant satisfied his desire or achieved his conscious objective and was aware of the nature of his conduct. In every statutory sense, then, the moment he was outside confines of the penitentiary his escape was a *fait accompli*. *Scott v. State*, supra; *Webb v. State*, 533 S.W.2d 780, at 788 (Tex.Cr.App.1976) (under former article 353b, P.C. 1925, circumstantial evidence sufficient to show intent to commit escape where accused fell or leaped from sixth floor window onto fourth floor roof).

■ In and after the seminal opinion in *Albrecht v. State*, 486 S.W.2d 97 (Tex.Cr. App.1972), this Court has stated, restated and iterated rules for excluding or admitting evidence of an extraneous offense. As explained there and elsewhere the rule of thumb is that "before evidence of collat-

---

6. Immediately after the indictment was read, in his opening statement the special prosecutor told the jury at the outset:

"... You have heard the indictment read. That is what the State must prove beyond a reasonable doubt by competent testimony from that stand."

He then outlined the testimony that would follow "to establish our case," *viz:* appellant was confined in TDC for aggravated robbery; Jordan was then warden of Beto II unit; the manner and means by which appellant, Dimsdle and one Faunta Minor made their escape during early morning hours; that a "massive" search went on all day until about seven o'clock when the escapees were located and captured "some five or six miles into Anderson County, where the citizens ... reside and have their homes."

In conclusion the special prosecutor explained:

"That, very simply, is the State's case. We must establish that by testimony from the stand, and if we so establish, we have established the offense of felony escape that that man, Donald Ray Fitzgerald, is charged with. I ask only that you listen to the evidence ... and make your decision from it[.] Thank you."

He never mentioned the Mayo affair. II SF 17–19.

eral crimes is admissible, a relationship between such evidence and the evidence necessary to prove that the accused committed the [charged] crime must be shown;" the pivotal inquiry is whether such evidence is relevant to a material issue in the case and, if so, then whether its probative value outweighs its inflammatory aspects or potential. *Id.,* at 99–100, and, e.g., *Williams v. State,* 662 S.W.2d 344, at 346; *Elkins v. State,* 647 S.W.2d 663, at 665 (Tex.Cr.App. 1983); *McCann v. State,* 606 S.W.2d 897, at 899–900, 901 (Tex.Cr.App.1980); cf. Tex. R.Cr.Evid. Rules 401 and 403. And since *Rubio v. State,* 607 S.W.2d 498 (Tex.Cr. App.1980) (Concurring opinion, at 502–503, 505–506), we have come to understand that the six socalled "exceptions" listed in *Albrecht* at 100–101 are neither exceptions to general rules nor tests for admissibility of an extraneous offense. *Morgan v. State,* 692 S.W.2d 877, at 879 (Tex.Cr.App.1985); *Williams v. State,* supra, at 346; *Elkins v. State,* supra, at 665–666; but see *Morgan,* supra, n. 9.

◼ Throughout course of trial, the matter of permitting the jury to become aware

of the two extraneous offense begged for a rationale.[7] Although the trial judge indicated he was admitting testimony of Mayo concerning the two extraneous offenses to refute appellant's claim of necessity, the court instructed the jury to consider them only in determining "the *intent* of defendant" in connection with the offense alleged against him, *"and for no other purpose."* [8] However, the fact that appellant did escape was uncontested, and even if a germane element of the offense of escape, his conscious objective and desire to depart from custody without authority was not only selfevident but is undisputed. Indeed, the nature of his defense concedes his act and culpable mental state. Therefore, evidence of extraneous offense committed twelve hours later was not admissible on the matter of intent to escape. The special prosecutor did not contend otherwise in the Court of Appeals, *Fitzgerald v. State,* supra, at 819–820, nor does he or the State Prosecuting Attorney claim it was admissible for that purpose before this Court.

Here the State presents essentially three bases for admitting the extraneous of-

7. When the question came up prior to voir dire, the prosecutor contended that "these other offenses are res gestae of the felony escape and go to intent, motive, design and the continuing criminal transaction of the felony escape" (SF February 18 Pretrial Hearing, at 8); that "[i]ntent would be going to their intent to remain at large and to avoid capture" (*id.,* at 9). The trial judge ruled that "for the present time, it should not be mentioned to the jury," and conditionally granted a motion in limine effective during trial (*id.,* at 10).

Later in proffering testimony of Mayo the prosecutor urged that "this was not an act of necessity but an act with intent to commit further felonies," see *ante,* at 878. The judge then asked, "Is it the State's theory that that rebuts the theory that 'All we are trying to do is get away from the danger inside the prison walls'?" The question turned out to be rhetorical for there was no response from prosecutors. IV SF 46.

8. In opening argument first prosecutor briefly alluded to Mayo, recalling his testimony that "he was accosted in his home that afternoon and was intruded upon by two of the inmates [and] he identified Fitzgerald as one of the inmates that come in his house with a knife and assaulted him; that he sustained wounds from that; that he shut the door on his head, and apparently then the door was forced open," and

adding, "And we don't know what happened—what would have happened then but for the action of his son with a shotgun that forced these inmates back out and on the run again." IV SF 72–73

In closing argument, the special prosecutor also recounted testimony of Mayo, and then impugned appellant for asserting a defense of necessity, *viz:*

"... If he was so concerned about his treatment in the Texas Department of Corrections, why didn't he come ask for help instead of attempting to come in somebody's home with a knife, injuring a man trying to protect his home.

Does that sound like necessity? Does that sound like a man that was worried about his treatment in Texas Department of Corrections? He wanted to get away. They wanted to get away because they didn't want to stay in prison anymore. They wanted to be back out on the streets, to prey on the citizens of this community as they have in the past. That's what we have here. We don't have some bad children that were sorely mistreated. We are dealing with aggravated robbery, murder, dangerous individuals. That's what our prisons are for.

The necessity in this case is to keep him in and not let him out. * * * *"
IV SF 82–84

fenses. We are confident that none makes the extraneous offenses relevant to proving the offense of escape and, even if relevant, the probative value is outweighed by danger of unfair prejudice, confusion of issues, and misleading jurors; they should have been excluded. We will examine them *seratim.*

First, the special prosecutor urges the extraneous offenses were admissible to show "context" of the act of escape or what the State Prosecuting Attorney calls "part of the same criminal episode as the escape." Both are alluding to the first discredited "exception" described in *Albrecht*, supra, at 100. See *ante* at 880. Given the unique nature of the offense of escape committed by appellant, we find it is inapplicable here.[9]

As alleged and proved by the State in its case in chief, appellant's unauthorized departure from custody in confinement in Beto Unit II began when he "broke out" of the dormitory and ended when he went through a hole cut in the fenced boundary of the unit. Paraphrasing *Scott,* supra, once he violated this boundary appellant was no longer in the custody of the warden. *Scott,* at 466. Thus the criminal "episode" of escape terminated before seven o'clock that morning. *Scott* and *Webb,* supra. That thereafter he was an escapee at large in the "free world" does not extend the criminal episode for purposes of admitting extraneous offenses that have no rela-

tionship whatever to "the evidence necessary to prove that accused committed the crime for which he stands charged," *Albrecht,* at 100. That is to say, evidence that appellant engaged in criminal misconduct some twelve hours after his escape was completed does not have any tendency to make the fact that he departed from custody without authority more probable than it would be without that evidence. Cf. *Williams v. State,* supra, at 347; see *Elkins v. State,* supra, at 666.[10]

■ Secondly, on the matter of flight, we observe that flight is not an essential element of the offense of escape because the offense itself is complete when an unauthorized departure from custody is made, See *ante,* at 879–880. Flight after commission of a crime may be regarded as "probative of a consciousness of guilt" in proper circumstances. *Fentis v. State,* 582 S.W.2d 779, at 781 (Tex.Cr.App.1976); Ray, Law of Evidence (3rd Ed.) § 1538, 2 Texas Practice 242; 18 Tex.Jur. 41 § 131, quoted in *Martinez v. State,* 140 Tex.Cr.R. 159, 140 S.W.2d 187, at 193 (1939).

Seeking to justify admitting the extraneous offenses on that basis, the State contends for general propositions collected in *Thompson v. State,* 652 S.W.2d 770, at 772 (Tex.Cr.App.1981), and earlier expounded in *Hunter v. State,* 530 S.W.2d 573, at 575 (Tex.Cr.App.1975). State's Brief, at 5–6; PDR by Special Prosecutor, at 4–5; PDR by State Prosecuting Attorney at 17–18,

---

9. That escape is unlike the offense of aggravated kidnapping in *Weaver v. State,* 657 S.W.2d 148 (Tex.Cr.App.1983), which the special prosecutor analogizes, is seen by the pertinent part of the opinion of the Court, *viz:*

"... [A]bduction, unlike burglary, is a continuing offense. Recall the definitions of 'abduct' and 'restrain'. A burglary is complete once entry is made with the requisite intent. The restraint in abduction does not necessarily 'occur' only at one specific time. [Victim] B.G. was retrained from the moment appellant pulled the knife, threatened her, and forced her to go to certain places within in and outside the house. The abduction was a continuous, ongoing event. There is no time limit for abduction. *Sanders v. State,* 605 S.W.2d 612, 614 (Tex.Cr.App.1980)."

*Id.,* at 150. Just as "breaking in" constitutes a completed burglary, so "breaking out" is a completed escape, not "a continuous, ongoing event" like kidnapping.

10. The decision of this Court in *Moreno v. State,* supra, at 301 is inapposite both in principle and in fact. The "episode" there began with accused's murdering two persons (the Garzas) at one location and continued for thirty minutes when it "blended" and became "closely interwoven" with "the case on trial" for his using the same murder weapon to kill a DPS Trooper who stopped him while speeding away from the first murders. We found "testimony relating to the killings of the Garzas was *extremely relevant* to placing appellant in possession of the murder weapon one half hour *before* the death of Trooper Boyd." *Ibid.*

wherein the latter also asserts, "This rule has been applied in *escape situations* numerous times."

However, in each case cited in support of that statement flight or escape either preceded or followed an offense *other than escape,* and it was "so connected with the offense on trial as to render it relevant as a circumstance bearing upon his guilt," *Hicks v. State,* 82 Tex.Cr.R. 254, 199 S.W. 487, at 488 (1917); accused was NOT on trial for escape in any of the cases cited for applying this rule.[11]

That line of authority might be pertinent on trial for one or the other extraneous offenses appellant allegedly committed against Mayo, but not vice versa. In the nature of such departures an escapee rarely lingers outside the place he has escaped; most likely one will flee away to avoid being captured and returned to the very custody from which he has just escaped. That he moves out and runs does not enhance his "consciousness of guilt" for having escaped in the first place.

Indeed, here in its case in chief the State proved flight by appellant, along with Dimsdle and Minor; in the course of twelve hours they traveled six to eight miles. The State also showed efforts made by officers to locate and apprehend them and their ultimate capture. The precise question is

whether testimony of alleged extraneous offenses against Mayo were relevant as circumstances bearing on guilt of appellant for his escape. The special prosecutor and State Prosecuting Attorney rely on *Hunter v. State,* supra, and the latter, asserting emphatically that the extraneous offenses "occurred in the *immediate* flight after an escape from prison in order to *facilitate* the escapees' further liberty and to prevent their capture," tells us that *"Thompson* alone is sufficient authority to reverse the Court of Appeals." We cannot agree.

Nothing in the evidence about the incident shows a facilitative purpose. The testimony of Mayo relating a ringing of his doorbell and the confrontation that followed at his front door (and there is none other about the incident) is purely descriptive of acts on the part of all involved. The only words spoken, apparently by Dimsdle, were "Hold it, man, back off." The best the prosecutor could make of it for the jury was in these words: "And we don't know what happened—what would have happened then but for the action of his son with a shotgun that forced these inmates back out and on the run again." IV SF 73. In short, the purpose or objective of the putative intruders is most ambiguous. The situation here is therefore unlike those of *Thompson* and *Hunter,* neither of which involved escape from a penal institution.[12]

---

11. The *status* of an accused as an escapee has been admitted in his trial on a primary offense in a variety of situations, but none is like this one.

   *Rumbaugh v. State,* 629 S.W.2d 747, at 752 (Tex.Cr.App.1982) (escape after arrest and detention for capital murder shown on trial for latter offense).
   *Arivette v. State,* 513 S.W.2d 857, 862 (Tex.Cr.App.1974) (flight to avoid consequences of criminal act of robbery by assault and attendant extraneous offenses admissible as part of "the whole criminal scheme").
   *Cherry v. State,* 488 S.W.2d 744, at 751 (Tex.Cr.App.1972) (prior escape from prison in another state shows motive of accused still at large in committing murder of officer investigating him and others in a motel room in Dallas).
   *Stephens v. State,* 147 Tex.Cr.R. 510, 182 S.W.2d 707, at 709–710 (1944) (former convictions and punishment and of escape from

   confinement admissible to show motive in killing deputy sheriff who recaptured accused).
   *Beard v. State,* 146 Tex.Cr.R. 96, 171 S.W.2d 869, at 875 (1943) (former conviction admissible on motive and malice to aid jury in assessing punishment on guilty plea to killing deputy sheriff in attempted escape from jail).
   *Stalcup v. State,* 130 Tex.Cr. 119, 92 S.W.2d 443, at 444 (1936) (former convictions and sentences show motive and intent in killing sheriff and escaping jail in his vehicle).

12. During evening hours Thompson and his confederate robbed the manager of a convenience store in Sealy and sped away westbound on IH 10; officers spotted them, gave chase, disintegrated the drivers side window and eventually caused the car to stop; its occupants fled on foot. The next morning Thompson appeared at the back door of the residence of one Janacek and after a bit of gamesmanship Thompson drew a pistol and "persuaded" Janacek and his

Finally, as to rebutting the defense of necessity, in the court of appeals the State succinctly presented its theory for admitting testimony of Mayo, *viz:*

"The motive of the accused and his necessity defense go hand in hand. By raising the issue of necessity [to justify his actions] Appellant placed his motive for escape in issue.... The evidence of burglary and attempted murder go to refute the defensive theory of necessity and show the Appellant's motive was to remain at large."

State's Brief, at 3; *Fitzgerald,* supra, at 820.

Assuming the evidence "has some relevance," and finding that "his reasonable belief that his immediate escape was necessary to avoid unlawful physical abuse at the hands of a correction officer was not necessarily inconsistent with his desire to

remain at large," the Tyler Court concluded that "any relevance of the evidence to refute the defense of necessity is clearly outweighed by the inherently prejudicial nature of the evidence itself." *Ibid.*

By way of their respective petitions for discretionary review, attorneys for the State mount various attacks on the reasons for that decision.[13] In the State's Brief filed in this Court the special prosecutor concentrates on the proposition that to commit extraneous violent offenses after escape from custody is "inconsistent" with a claim of necessity for escape from threats of harm by a TDC officer. He argues that "it is logical that one had no need to perpetrate violent acts once removed from Officer Anderson's control;" that "the harm to be prevented [by the law proscribing escape from custody] is allowing convicted violent felons to roam at

---

wife to let him leave in their car; he was arrested about two hours later approximately sixteen miles away, with their credit card in his possession. This Court found that "the extraneous offense was admissible, being 'part of and incidental to the appellant's attempted flight to avoid arrest [for the first robbery].' *Hunter v. State,* supra, at 575." *Id.,* at 773.

In August, Hunter and two others robbed an attendant of a liquor store. Still at large on an evening in November and while a Buick automobile was under surveillance by uniformed officers in a marked patrol vehicle, Hunter and two companions left a restaurant, got in the Buick and Hunter drove off. When the officers turned on red lights and siren and pulled in behind him, Hunter accelerated, a shot was fired from inside through the rear window of the Buick, and the chase was on. More shots were fired at the police unit, Hunter turned into a dead end street and the Buick jumped a curbed, hit a post and came to a stop. Hunter stepped out, fired a shot of the officers and ran, firing one more time. He was hit by a shotgun blast and an officer placed him under arrest. Reciting the litany of "flight to avoid arrest" cases, the Court held that "[e]vidence of the circumstances surrounding appellant's arrest was properly admitted." *Id.,* at 575.

The theory is that actions suggest "consciousness of guilt" of an offense for which the accused has not yet been arrested or tried. For that purpose it has no rational relationship to a completed escape from confinement in a penal institution after conviction for a criminal offense.

**13.** In his PDR the special prosecutor asserts:

"The defense of necessity raised by the defendant is basic to the State's introduction of the extraneous offenses ... In this context, it is clear that the desire to escape to avoid physical harm and the commission of violent felonies are inconsistent. The desirability and urgency of avoiding physical harm can be great. Once the harm is avoided, the urgency, if not the desirability, of maintaining the situation is over. Once the defendant was out of the prison unit, the threat of physical harm from the guard was over, as was the urgency of escape.... Once the defendant had removed himself from the immediate necessity of avoiding Officer Anderson, he did not have carte blanche to perpetrate violent acts upon members of the community."

*Id.,* at 5–6.

For his part the State Prosecuting Attorney argues that their conduct after escape belie efforts by defense to portray appellant and Dimsdle as "innocent victims of TDC brutality," essentially because armed with a knife appellant tried to break into Mayo's home, did cut him, and left only when threatened with a shotgun. "Moreover," he asserts, "appellant's assault on Mayo's home and person cannot be justified by anything TDC Guard Anderson had purportedly done to appellant or Dimsdle, as no connection between Mayo and Anderson is even suggested." He submits that what appellant did is "inconsistent with an 'innocent' escape from TDC" in that "An 'innocent' escapee would want to *avoid* committing subsequent criminal acts in order to prevent future additional and *prolonged* confinement." PDR, at 20–21 (emphasis in original).

large in the community;" so that "[t]o rule that perpetrating vicious attacks on innocent citizens to avoid capture is consistent with a necessity to avoid one officer with TDC is ludicrous." *Id.,* at 6–7. He cites no authority.

All the pretrial and trial arguments made by the State on this issue, see, e.g., *ante,* at 878 and 880, nn. 7 and 8, and appellate presentations in briefs and PDRs demonstrate the difficulty in formulating a rational basis for justifying admitting the extraneous offenses as evidence of refutation.

Appellant responds in pertinent part, *viz:* "... None of the extraneous offenses admitted over objection had any probative value whatsoever to disprove [appellant's] defensive theory of necessity; nor were they necessary to establish any element of the offense of escape. The offenses of attempted murder and burglary of a habitation cannot logically relate to the need to escape from prison to avoid threats made by a guard. Nor do they tend to disprove such a need."

Brief, at 8.

Necessity is a traditional defense at common law, and is now included in most revised penal codes. Texas did not have a statute recognizing a general principle of necessity (some former statutes allowed it in specific situations, e.g., article 1196 [abortion to save life of mother]), and the Court declined to adopt it; but see *Woods v. State,* 135 Tex.Cr.R. 540, 121 S.W.2d 604 (1938). However, § 9.22 "firmly establishes its existence and spells out the details of its application." Practice Commentary to § 9.22. Yet, it is still a general principle, admitting its application on an ad hoc determination of "the myriad variety of harms to avoid which a person is justified in committing an offense." *Ibid.*[14]

Under § 9.02 the Court seems to have accepted that in compelling enough circumstances an escape may be justified, but "to seek aid from legal counsel and get relief from sordid jail conditions" are not among them. *Branson v. State,* 525 S.W.2d 187 (1975); see *Acosta v. State,* 660 S.W.2d 611, at 614 (Tex.App.—Corpus Christi 1983), no PDR history (evidence of bleeding ulcer failed to show accused "believed his escape was necessary to prevent harm to him," and thus did not raise the issue of necessity).

Here, of course, the trial court fully instructed the jury on the issue. See *ante,* at 878, n. 4. We note also that Corrections Officer Anderson did not testify at all, in rebuttal or otherwise; nor does the State direct us to any testimony tending to refute factual accounts of Dimsdle concerning acts and conduct attributed to Officer Anderson. Thus his evidence going to "necessity" is undisputed.

As in *Jamerson v. State,* 550 S.W.2d 287 (Tex.Cr.App.1977), we must determine "whether the extraneous offenses had probative value in disproving appellant's defensive theory," *id.,* at 288. However, "there may be some defensive theories which are incapable of being logically rebutted by the proof of an extraneous offense." *Ibid. Holley v. State,* 582 S.W.2d 115, at 118–119 (Tex.Cr.App.1979) (further sexual assaults on women other than victim not probative on defensive issue of insanity); *Ford v. State,* 484 S.W.2d 727, at 732 (Tex.Cr.App.1972) (subsequently committed extraneous offense does not refute defense of alibi on day of primary offense); see also *Alvarez v. State,* 511 S.W.2d 493, at 495 (Tex.Cr.App.1973) (that since an earlier homicide accused always carried a weapon "is in no way probative of [his] state of mind at the time of the killing in the instant case").

**14.** In the broadest context of escape, see generally *Miers v. State,* 34 Tex.Cr.R. 161, 29 S.W. 1074 (1895), and followings; *West Virginia ex rel McGilton v. Adams,* 143 W.Va. 325, 102 S.E.2d 145, 70 A.L.R.2d 1425 (1958), and Annotation, *What Justifies Escape or Attempt to Escape,* 70 A.L.R.2d 1430, at 1452, § 13 "Conditions of Confinement." In a more narrow sense of escape from prison, see *Thiel v. State,* 676 S.W.2d 593, at 599 (Tex.Cr.App.1984) (Appendix to opinion of Teague, J.); see also Comment, *Necessity as a Defense to Prison Escape in Texas,* 21 S.Tex.L.J. 211 (1981).

In context of this cause the requisite condition of the defense of necessity is that the actor *"reasonably believes"* his unauthorized departure from custody in the penitentiary is "immediately necessary to avoid imminent harm." § 9.22(1). (The remaining exercise in subd. 2 of balancing harms is dependent on a finding that the professed belief is reasonable.) Thus the factfinder is first called on to evaluate a given perception of the situation as it appeared to be just before departure from custody. The examination can only focus on germane facts and circumstances then in existence, for they give rise to the actor's belief of "necessity" to leave custody. His belief that to escape is immediately necessary becomes fixed the moment he acts on it. Just as the offense of escape is complete once he actually departs from custody, so it is too late to reconsider and amend that which he "reasonably believes" made his leaving so necessary in the first place. Whether his escape was justifiable will then be tested initially on reasonableness of his preexisting belief.

Accordingly, justification through necessity is in this instance one of those defensive theories that are incapable of being logically rebutted by proof of an extraneous offense. That an escapee later in time and place committed extraneous offenses or engaged in other misconduct has no bearing on whether at the threshold he reasonably believed it immediately necessary to leave custody in confinement to avoid imminent harm. Mayo's testimony that appellant intruded into his farmhouse twelve hours after escape does not tend to make existence of any fact that is of consequence in determining elements of "necessity" more or less probable than it would be without his evidence. See *Holley v. State*, supra, at 118; *Jamerson v. State*, supra, at 288; *Ford v. State*, supra, at 731. In short, it is not relevant to any material issue in the defense of necessity.

For reasons developed *ante* we conclude that the two alleged extraneous offenses were inadmissible, and therefore agree the

Tyler Court properly sustained the related second point of error. We overrule these grounds for review.

The judgment of the Tyler Court of Appeals is affirmed.

WHITE, J., dissents.

TEAGUE, Judge, concurring and dissenting.

I agree wholeheartedly with the disposition that the majority opinion by Judge Clinton makes of the contention urged on behalf of Donald Ray Fitzgerald, henceforth appellant, that the trial judge erred in admitting into evidence at the punishment stage of the trial, for enhancement of punishment purposes, appellant's conviction for aggravated robbery that was an essential element of the primary offense of escape, for which appellant was on trial. Therefore, I agree with that part of the majority opinion. Also see *Mc Williams v. State*, 782 S.W.2d 871 (Tex.Cr.App. delivered this date).

However, I find that I am unable to agree with the disposition that the majority opinion makes of appellant's other contention, that the trial judge erred in admitting over objection certain extraneous offense testimony that related to criminal acts committed by appellant and another after he and his cohort had escaped from the Beto II Unit, and that the Tyler Court of Appeals did not err in overruling the trial judge's ruling. See *Fitzgerald v. State*, 722 S.W.2d 817 (Tex.App.—Tyler 1987).

Although I am generally not in favor of admitting extraneous criminal offenses into evidence during the accused's trial, see, for example, the dissenting opinion that I filed in *Dickey v. State*, 646 S.W.2d 232 (Tex.Cr. App.1983), in this instance, because appellant raised the defensive issue of just what his intent might have been when he escaped from one of the units of the Department of Corrections, which I find was a factual issue for the jury to resolve, and the jury was so instructed, I am unable to agree that the extraneous criminal offense testimony was inadmissible evidence.

The relevant facts are not in dispute. The record reflects that during its case in chief, the State tried a "clean" case. The State proved up in its case in chief the fact that early one morning appellant and another inmate escaped from the Beto II Unit of the Department of Corrections. For rebuttal purposes, and over objection, the State was permitted to introduce into evidence extraneous offenses which established that after appellant and his fellow inmate escaped from the unit, at a short distance from the unit, they attempted to break into a non-inmate's residence and that appellant cut the non-inmate with a knife he was then armed with. The two then fled into nearby woods where they were soon apprehended.

The trial judge charged the jury at the guilt stage of the trial on the defense of necessity and further instructed the jury that they could consider the extraneous offense testimony only "in determining the intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose."

It is obvious to me that the majority opinion, in rejecting the State's contention that the extraneous offense testimony was admissible to refute or rebut appellant's defense of necessity, focuses its attention on the admissibility of such evidence as it might relate to the crime of escape, and not as it might be rebuttal testimony. The majority opinion holds:

> Just as the offense of escape is complete once he actually departs from custody, so it is too late to reconsider and amend that which he 'reasonably believes' made his leaving so necessary in the first place ... That an escapee later in time and place committed extraneous offenses or engaged in other misconduct has no bearing on whether at the threshold he reasonably believed it immediately necessary to leave custody in confinement to avoid imminent harm ... In short, it is not relevant to any material issue in the defense of necessity.

I disagree. Taken to its logical conclusion, in an escape case, where the defense of necessity is raised by the evidence, and the jury is instructed thereon, the majority opinion would prevent the State from showing after the defendant escaped he committed extraneous criminal offenses.

In *Dickey*, supra, the majority opinion pointed out that "An exception to the rule that an accused may not be tried for a collateral crime is that evidence of an extraneous offense may be admissible to refute a defensive theory raised by the accused...."

Although I agree that testimony concerning what occurred beyond the penal institution's boundaries would be irrelevant and immaterial to the charge of escape, and thus inadmissible during the State's case in chief, I find that when the accused presents defensive testimony that his intent when he escaped was that of necessity, i.e., he escaped to avoid having serious bodily injury inflicted upon him by a prison guard, he placed into evidence his intent, and extraneous criminal offense testimony becomes admissible to negate that intent.

The defense of necessity to the crime of escape has been part of the law for almost 700 years, see *Thiel v. State*, 676 S.W.2d 593, 599 (Tex.Cr.App.1984) (Teague, J., dissenting opinion), when the English scholar Lord Plowden observed that a prisoner need not remain in prison when the prison is on fire and is justified in escaping from the prison for this reason, "for he is not to be hanged because he would not stay to be burnt." Thus, the offense of escape is certainly not and should not be considered a strict liability crime.

Here, appellant gave a valid and reasonable reason why he escaped from the Beto II Unit.

I agree with the State's argument, that "An 'innocent' escapee would want to *avoid* committing subsequent criminal acts in order to prevent future additional and *prolonged* confinement." (Page 21 of State Prosecuting Attorney's Petition.)

When appellant presented his defense of necessity, he "opened the door" to the State to rebut or refute that defense with evidence that would negate his intent to escape-because of fear that a guard was going to inflict serious bodily injury on him and he could not find any protection within "the walls" of the Unit. I find that the State was entitled to present evidence to show that appellant escaped for reasons other than to avoid imminent serious bodily injury at the hands of a prison guard.

Appellant presented evidence that he escaped from lawful custody to avoid having imminent serious bodily injury inflicted upon him by a prison guard, i.e., he escaped to be free from imminent danger from the guard and for no other reason. Although perhaps questionable, see *Thiel v. State*, supra, at 600 (Teague, J., dissenting opinion), the trial judge found this evidence sufficient to support a charge on the defense of necessity and so instructed the jury. In short, the trial judge found that the evidence was sufficient to show that appellant went "over the wall rather than remain and become a martyr." See *Branson v. State*, 525 S.W.2d 187 (Tex.Cr.App.1975). From appellant's perspective, at least by his defensive evidence, he was confronted with an imminent life threatening situation. Also see *Acosta v. State*, 660 S.W.2d 611 (Tex.App.—13 Dist.1983). The jury was instructed that if it believed appellant's defensive testimony they should acquit appellant.

There are many reasons why an inmate might escape or attempt to escape from the Department of Corrections; some valid and reasonable and some not so valid and not so reasonable. From the State's standpoint, the record reflects that appellant wanted to escape simply to escape from further confinement. There is no evidence in the record that might support the claim that after he escaped appellant sought or attempted to seek outside assistance about his problem with the prison guard. Thus, just what appellant's "intent" might have been when he escaped from the Beto II Unit was certainly a relevant issue in the case for the jury to resolve, especially given the trial judge's charge to the jury. There is no evidence in this record that after appellant escaped, when appellant attempted to break into the residence he was doing so only to obtain shelter or food and clothing. In fact, the record reflects that when appellant rang the doorbell to the non-inmate's residence he was armed with a knife. After the owner of the residence answered the doorbell, appellant first attempted to assault the owner and thereafter succeeded in cutting the owner's little finger and chest. Appellant and his cohort then fled that scene, rather than fleeing the scene when they first realized that the residence was not without occupants.

Therefore, I find that the extraneous offense testimony was admissible evidence as it was relevant to a material issue in the case, namely, appellant's intent when he escaped from the Beto II Unit, and that its relevancy value on the issue outweighs its inflammatory or prejudicial potential. E.g., *Williams v. State*, 662 S.W.2d 344 (Tex.Cr.App.1984).

For the above and foregoing reasons, I respectfully dissent to the majority's holding that the extraneous offense testimony was not admissible as rebuttal evidence.

CAMPBELL and BERCHELMAN, JJ., join.