

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-13-00122-CR

CARLOS GARZA, JR., APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 320th District Court
Potter County, Texas
Trial Court No. 65731-D, Honorable Don R. Emerson, Presiding

April 9, 2014

## MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellant, Carlos Garza, Jr., appeals from the trial court's judgment finding him guilty of aggravated assault with a deadly weapon[1] and imposing an enhanced sentence of twenty-five years' imprisonment. On appeal, he challenges the sufficiency of the evidence to support his conviction. We will affirm.

---

[1] *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2011).

Factual and Procedural History

Cousins, Andrew and Orlando Garza, were visiting their grandmother Elizabeth on the night of July 24, 2012. Accompanying the cousins were their wives and Andrew's infant daughter. The group left the house that night to get ice cream for the family and returned with some ice cream for Elizabeth. While they had been gone, appellant, who is the cousins' uncle and Elizabeth's eldest son, had returned to the home that he shared with his mother. He had been drinking at a friend's house.

After Andrew came inside the house to deliver the ice cream to his grandmother, he overheard appellant talking to Elizabeth from the kitchen and using profane terms to refer to Andrew and Orlando. We learn later that he was calling Elizabeth bad names as well. Andrew resisted the urge to confront his uncle about the ill treatment of Elizabeth and his foul language, went into another room, and, shortly thereafter, decided to leave. His decision may have come at the urging of Elizabeth, but it was, at a minimum, with her support; though not at all in a hostile spirit toward her grandsons, Elizabeth did think it was best if Andrew and Orlando left, at least for a brief period, while things calmed down around the house. It was appellant's birthday, and he had been drinking enough that most of the family noticed and considered him intoxicated. Elizabeth also explained that appellant was upset because no one had called him on his birthday. Considering the sour and seemingly volatile climate at the house at the time, the cousins and their families would do better to let things settle down.

Andrew went outside to join the rest of the family and prepare to leave. Elizabeth followed him outside and declined his invitation to leave with them. Andrew gathered up his daughter and loaded her into the car. He then went back inside the house briefly to

2

ask his uncle what was wrong; his inquiry was ignored and Andrew went back outside. As the group was preparing to part ways, appellant came out on to the front porch. There is some conflict as to whether appellant had the weapons he would later employ with him when he first came out to the porch or whether he went back inside to get them. Either way, appellant had two weapons at the ready: a knife and a hatchet/hammer-type implement.

From the porch, appellant accused the family of talking about him and expressed his displeasure with such behavior. Andrew once again tried to coax his uncle into revealing what was wrong and why he was so angry. He and the rest of the family assured him that they were not talking about him, and Andrew tried to convince appellant to calm down. But Andrew's attempts did little to calm appellant. Appellant began to issue threats against Orlando, who, it seems, had been quietly finishing his ice cream as tensions began to escalate. Andrew testified that appellant threatened to hurt and kill Orlando. Orlando testified that appellant threatened to harm him and called him bad names.

Andrew stepped into the fray at this point to draw attention away from the younger Orlando, who, according to Andrew, was just standing there looking scared. Andrew leaned over to pick up a tire iron, had it in his hand, and then thought better of it and dropped it without ever having stood up with it in his grasp. Andrew announced his intent to prevent appellant from doing any harm to Orlando and, in an attempt to disarm appellant and keep appellant's hostilities focused on him rather than anyone else in the family, invited his uncle to come down off the porch, to drop the weapons, and to fight Andrew with his fists. Appellant did come down off the porch and appeared to be ready

3

to fight Andrew but not with fists only. Instead, appellant held up his two weapons and charged at Andrew, all the while threatening harm to him. As appellant rapidly approached Andrew, Andrew took a swing at appellant, according to Andrew, in the hope of putting some distance between the two men and, according to Orlando, in such a way that it appeared Andrew was trying to knock the weapons from appellant's grasp. Andrew ran from appellant out of the yard and into the street and continued to evade appellant's advances until police arrived in response to Andrew's wife's call, at which time appellant promptly threw the weapons down.

Appellant testified that he went outside only because he did not know "what was going on" and wanted to find out. He explained that he believed the two African-American males who were outside and across the street were conspirators in some type of plot with Andrew and Orlando to attack or harm appellant. Appellant described the setting outside as "fishy." As it turned out, the cousins did not know the two gentlemen across the street, and there was no evidence that an ambush had been planned against appellant. Appellant testified that he had carried with him onto the porch the knife he had been using in the kitchen and only grabbed the hatchet as he was coming onto the porch, he says, while he was in the front doorway, and only because Andrew, who, appellant testified, is bipolar and likes to "play[] captain hero," had started provoking him and had grabbed the tire iron. He explained he did not go out there to harm anyone and only went outside to find out what was happening.

Appellant supplied no clear reason for having come down off the porch and charging after Andrew with the weapons. He does, however, admit to the conduct to some degree, though rather vaguely:

4

Basically, it was one of them – it was like a magnet, you know. They were provoking me. I would go out there half way to the – to the – to the front yard, and then when I would see they wasn't – they was just talking baloney, I would come back and they would try to grab me from behind, as he – as he testified to, you know. So I would turn around. It was one of those kind of things.

And I was walking to the house when the officer told me to – drove up with the lights on and told me. I did not even see the officers coming. I threw them weapons down before the officers even came.

He characterized the interaction between him and Andrew as "going at each other," during which appellant would move toward Andrew and then Andrew would move toward him.

Appellant also admitted that he simply could have gone back inside the house, and he acknowledged that, when he first came outside, it appeared that Andrew was preparing to leave, an observation which seems inconsistent with his position that he feared an attack by four larger, younger males was imminent. He did testify several times as to how Andrew was provoking him. He admitted, too, that he did threaten Andrew with bodily harm but denied having threatened to kill him; "[h]e's my nephew," appellant explained. Appellant maintained that, before the police arrived, he had already thrown down his weapons and gone inside the house, having realized that his nephews were "just talk."

Following a trial to the bench, the trial court found appellant guilty of aggravated assault with a deadly weapon as charged and sentenced appellant to twenty-five years in prison. In his sole issue, appellant contends that the evidence is insufficient to support his conviction for aggravated assault because the circumstances presented at the time made it immediately necessary for him to charge after Andrew while wielding two deadly weapons. *See* TEX. PENAL CODE ANN. §§ 2.03, 9.22 (West 2011).

5

## Standard of Review

The defense of necessity is a defense to prosecution under Section 2.03 of the Texas Penal Code. *See id.* §§ 2.03, 9.22. A defendant asserting a Section 2.03 defense has the burden of producing some evidence to support his claim of the defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Smith v. State*, 355 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Once the defendant produces that evidence, the State bears the ultimate burden of persuasion to disprove the raised defense. *Zuliani*, 97 S.W.3d at 594. The burden of persuasion does not require that the State produce evidence disproving the defense; rather, it requires that the State prove its case beyond a reasonable doubt. *See id.*; *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) (en banc). If the jury finds the defendant guilty, then it implicitly rejects his defensive theory. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914. So, in analyzing the sufficiency of the evidence in this context, we look not to whether the State presented evidence which refuted appellant's necessity defense testimony; rather, we determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the charged offense beyond a reasonable doubt and also would have found against appellant on the defense of necessity beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914 (citing the well-established sufficiency-of-the-evidence standard as outlined in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)); *see also Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).

6

A person commits assault if he "intentionally or knowingly threatens another with imminent bodily injury." TEX. PENAL CODE ANN. § 22.01(a)(2) (West Supp. 2013). An assault becomes aggravated if the actor commits assault and uses or exhibits a deadly weapon during commission of the assault. *See id.* § 22.02(a)(2). The Texas Penal Code provides that a person's conduct is justified, however, if the following elements are established: (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear. *Id.* § 9.22.[2]

A "[r]easonable belief" is "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42) (West Supp. 2013); *Sanchez v. State*, 418 S.W.3d 302, 309 (Tex. App.—Fort Worth 2013, no pet.). Whether the accused's belief is reasonable is a question of fact and should be viewed from the accused's standpoint at the time he acted. *See Fitzgerald v. State*, 782 S.W.2d 876, 885 (Tex. Crim. App. 1990) (en banc). A defendant's belief that his conduct is immediately necessary to avoid imminent harm is unreasonable as a matter of law—even if entirely sincere—when the undisputed facts demonstrate a complete absence of "immediate necessity" or "imminent harm" as legally defined. *See Dewalt v.*

---

[2] The confession and avoidance doctrine applies to the necessity defense. *Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010). Therefore, a defendant must admit to the conduct—both the act and the culpable mental state—of the charged offense to be entitled to a necessity instruction. *Id.*; *see Wood v. State*, 271 S.W.3d 329, 334 (Tex. App.—San Antonio 2008, pet. ref'd). For the purpose of addressing and disposing of the sole issue raised on appeal in the instant case, we will assume without deciding but with no small amount of doubt that appellant sufficiently confessed to the act charged such that he would have been entitled to an instruction on necessity.

*State*, 307 S.W.3d 437, 454 (Tex. App.—Austin 2010, pet. ref'd); *Washington v. State*, 152 S.W.3d 209, 212 (Tex. App.—Amarillo 2004, no pet.). "'Imminent' means something that is impending, not pending; something that is on the point of happening, not about to happen." *Schier v. State*, 60 S.W.3d 340, 343 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *Smith v. State*, 874 S.W.2d 269, 272–73 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). "Imminent" requires a present, rather than future, threat. *See Garcia v. State*, 972 S.W.2d 848, 849 (Tex. App.—Beaumont 1998, no pet.) (citing *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989) (en banc)). "[I]mminent harm" exists "when there is an emergency situation and it is 'immediately necessary' to avoid that harm, when a split-second decision is required without time to consider the law." *Schier*, 60 S.W.3d at 343; *Smith*, 874 S.W.2d at 273.

Analysis

The State maintains that the evidence is sufficient to prove all the requisite elements of the charged offense beyond a reasonable doubt and, further, that the record supports the fact-finder's implicit rejection of the conclusion that Andrew, who was outside and preparing to leave the premises, posed a threat of "imminent harm" to appellant such that it became immediately necessary for appellant to come outside, come down off the front porch into the yard, and chase Andrew into the street while wielding a knife and a hatchet. We agree.

The elements of aggravated assault as charged here required the State to prove the following: (1) Appellant (2) intentionally or knowingly (3) threatened Andrew with imminent bodily injury while (4) using or exhibiting a deadly weapon, namely, a knife or a hatchet, or a combination thereof, during the commission of the assault. *See* TEX.

8

PENAL CODE ANN. § 22.02(a)(2).  Without contradiction, the record reveals evidence that both the knife, described by one witness as "a foot-long butcher knife," and the hatchet, a hatchet/hammer combination tool apparently used in the roofing industry, were deadly weapons.  *See id.* § 1.07(a)(17)(B) (defining a "[d]eadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury").

The record further establishes that appellant came outside to the porch with the deadly weapons, came down off the porch after issuing threats to his nephews for some time, and charged after Andrew while bearing those weapons and threatening to kill and harm him, coming very near to him—near enough that Andrew was almost able to hit him—before Andrew fled into the street.  At trial, Andrew expressed his belief that, had he not run when he did, he would be "dead for sure."  We do recognize that appellant described the interaction rather differently; the trial court, sitting as finder of fact, was free to disregard appellant's account and was charged with resolving conflicting testimony.  *See Joseph v. State*, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995) (en banc) ("The trial judge, when sitting as the sole trier of facts, is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony.").

Appellant acknowledged that, when he came outside, Andrew was preparing to leave and also conceded that, instead of leaving the porch and charging after Andrew, he simply could have gone back inside the house.  *See Schier*, 60 S.W.3d at 343.  Appellant's testimony also suggests that he may have acted so aggressively because he perceived Andrew and the others as "provoking" him.  However, the Texas Penal Code provides no justification for conduct undertaken as a result of such verbal provocation.  Appellant explained that he went outside to the porch to see "what was

going on." He did not provide a clear explanation of why he came down off the porch and into the yard where the rest of the family was, other than, perhaps, his insistence that Andrew was provoking him to do so. A "reasonable and prudent man" under the circumstances presented here would not have believed that Andrew, who was positioned outside the house and well away from appellant and who was preparing to leave when appellant came outside, posed a present, impending threat of harm to appellant such that it was immediately necessary for appellant to charge after Andrew with a knife and a hatchet. *See id.*; *Garcia*, 972 S.W.2d at 849; *see also* TEX. PENAL CODE ANN. § 1.07(a)(42).

Viewing the evidence in the light most favorable to the verdict, we conclude that sufficient evidence supported the trial court's verdict that appellant was guilty of aggravated assault with a deadly weapon as charged and the trial court's implicit rejection of appellant's asserted defense of necessity. *See Saxton*, 804 S.W.2d at 914. Accordingly, we overrule appellant's sole point of error.

Conclusion

Having overruled appellant's sole issue on appeal, we affirm the trial court's judgment of conviction. *See* TEX. R. APP. P. 43.2(a).

Mackey K. Hancock
Justice

Do not publish.

10